[No. H017366. Sixth Dist. Apr. 16, 1999.]

TIMOTHY DEEGAN, Plaintiff and Respondent, v.
CITY OF MOUNTAIN VIEW, Defendant and Appellant.

## Counsel

Robinson & Wood, Thomas R. Fellows; Michael D. Martello and C. Shelley
Emerson for Defendant and Appellant.

Jackson & Abdalah, Richard K. Abdalah and Michelle M. Janigian for Plaintiff and Respondent.

## OPINION

**WUNDERLICH, J.**—The City of Mountain View (City) appeals from the trial court's judgment on a writ of administrative mandate brought by Timothy Deegan (Deegan), a terminated water utility worker. After internal appeals, City's appeals board recommended termination of Deegan's employment based on a 1994 reckless driving incident, but came to a split decision regarding the discipline to be imposed for earlier rule violations. The trial court found that Deegan had committed the misconduct and that he had violated City's personnel rules and regulations, but that the disciplinary action taken—termination—had been excessive, constituting an abuse of discretion. City assigns error primarily in the standard of review used by the trial court. For the reasons stated below, we reverse.

### STATEMENT OF FACTS

■    We are bound by the trial court's factual findings as long as they are supported by substantial evidence. We indulge every reasonable inference and presumption in favor of the trial court's findings. (*Barber* v. *Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659-660 [53 Cal.Rptr.2d 4] (*Barber*).)

Deegan committed some minor transgressions before the two major incidents which led to his termination. In 1993 he was working for City as a Water Utility Worker III. On May 21, 1993, Deegan was seen at work on a public street not wearing an orange safety vest, in violation of Cal-OSHA (California Occupational Safety and Health Administration) regulations and City's safety rules. Deegan had been suspended previously, in June of 1992, for failing to follow safety rules and failure to wear safety gear, and had been warned about this conduct. The 1993 conduct was later determined to be a violation of section 7.04(4) of the City's personnel rules (violation of safety rules).

On June 15, 1993, Deegan failed to call in a water main shutdown at Bryant and Richmont. This omission created a public safety hazard. Also, during the summer of 1993, some temporary paving repairs had to be made twice on a project under Deegan's supervision because the work—vouched for by Deegan—had not been properly completed. These omissions were found to be a violation of section 7.04(7) of the City's personnel rules (refusal or failure to perform work assigned).

On July 13, 1993, Deegan's immediate supervisor, Karl Kraft, met with Deegan to discuss problems with his job performance, including his failure to follow safety rules, abandoning a jobsite in order to go jogging, repeated tardiness, failure to use time/materials effectively, disrespectful treatment of coworkers, problems with honesty, integrity, accepting feedback and following policies and procedures. During that meeting, Deegan retorted to his supervisor that he was "blowing smoke" and went on to refer to his senior department manager (Bob Lillard) as "fucking Lillard." This behavior was later cited as a violation of section 7.04(11) of the City's personnel rules, (disobedience or insubordination to proper authority). Abusive, disrespectful and threatening behavior towards coworkers had been noted as an issue for Deegan in the past.

*The Performing Arts Incident on August 3, 1993*

On August 3, 1993, between 11:45 in the morning and 12 noon, Deegan arrived at the loading area behind City's center for the performing arts intending to play basketball during his half-hour lunch break. The paved area had been fitted with a movable basketball backboard and removable net, for occasional and casual recreational use by various City employees. The backboard was to be used, if at all, only on an as-available basis whenever the loading area was not being used for the ongoing operations of the performing arts center. The basketball rim and net were stored in a nearby employees' locker room along with a stepladder to facilitate installation.

On this day, TheatreWorks, a private production company, was renting the theater facility for an upcoming production and was loading stage equipment from the loading zone. According to Deegan's companion Phil Lanides, they asked someone to move his car and the man replied, "You f—ing city people. Why don't you just leave us alone." Then Deegan went into the performing arts center and approached Dan Wadleigh (Wadleigh), the technical director of TheatreWorks. Deegan shouted to Wadleigh that his people would have to "move their fuckin' cars or they'll have them moved." Deegan also said: "This happens every time you fuckin' people come in here and we are sick of it."

Wadleigh and Ann Quirion (Quirion), an hourly employee for City working at the center, went upstairs to notify Terri Cranmer (Cranmer), the technical services director for the center. Quirion told Cranmer that Deegan was "cursing up a storm" and that she felt personally harassed by him. Quirion had experienced similar encounters with Deegan in the past.

Cranmer came downstairs and told Deegan she would not interfere with the center's operations merely to accommodate his basketball game. Deegan

replied, "You just don't get it, do you? You can't park back there." Cranmer explained to him that City rented the facility to outside organizations and that TheatreWorks was entitled to use the loading and unloading area. To this Deegan responded: "I'm going to post it back here and have all the cars towed. You really don't get it, it says, 'No parking in the loading zone.'" Deegan again repeated his threat to have all the cars towed, however, he had no authority whatsoever to post or enforce parking regulations or to regulate the use of the center. Deegan returned to work, late.

Cranmer, upset at the prospect of having all the vehicles behind the center towed, contacted Deegan's supervisor, Karl Kraft, and learned that Deegan had no authority to post parking restrictions and no authority to tow vehicles, except in connection with ongoing water repair projects.

Deegan argued and the trial court found that this incident occurred while he was off duty. The City agency found Deegan to have committed conduct or behavior not becoming an employee and offensive treatment of the public or fellow employees (§ 7.04(1) and (10) of the City's personnel rules).

On September 20, 1993, following its investigation of Cranmer's complaint, and after a predisciplinary hearing, City served Deegan with a *Skelly*[1] notice, advising of its intention to take disciplinary action in the form of a temporary suspension, demotion to Water Utility Worker I and removal from City's voluntary duty program. The *Skelly* notice cited as grounds for discipline the performing arts center incident, as well as a perceived pattern of prior similar incidents involving alleged abusive treatment of coworkers, supervisors, management and the general public, along with some performance problems.

Deegan took an informal appeal, and the personnel officer recommended that the discipline be mitigated slightly, by demotion to Water Utility Worker II, rather than Water Utility Worker I. The officer concluded by saying that if Deegan's abusive behavior or performance problems continued, he would be subject to further discipline, including termination.

Following this informal appeal, Deegan was advised of his right to take a formal appeal, with evidentiary hearings before a full appeals board. While his formal appeal was pending, Deegan recklessly drove a five-ton City truck, the misconduct leading to his termination.

---

[1] (See *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774] [because continued employment is a property right, a state permanent civil service employee has a due process right to a hearing before he is disciplined/terminated].)

*March 3, 1994, Reckless Driving Incident*

About 7:00 a.m. on March 3, 1994, while on duty driving a 10,000-pound City dump truck, Deegan was westbound on Highway 237 approaching the Whisman Road exit. He was driving in the far right lane, and appeared to be about to exit the highway. Suddenly he crossed over the solid white lines marking the exit without warning or any turn signal, and crossed in front of a Geo Metro, driven by Mrs. Cidalia Anderson (Anderson), a citizen. A near-collision occurred.

When Anderson honked her horn at Deegan, he suddenly slammed on the brakes of the City truck, coming to a complete stop—without apparent reason—in the middle of Highway 237, while nearby traffic continued to move at 55 miles per hour. Shaken, Anderson barely missed having her small car go underneath the City truck. She immediately called City to complain. In her subsequent letter to City she said: "As if all that wasn't bad enough, the driver then had the audacity to give me the finger and laugh at the situation. I didn't find what happened to be the least bit amusing; if anything it angered me that someone who works for the city, in a city truck, would have the nerve to do that. I am just glad that no one got hurt. [¶] I'm truly disappointed with his behavior and hope that the City of Mt. View doesn't normally hire that type of person. I understand that we all have bad days, but that is not a good reason to try and cause an accident."

Anderson was not the only citizen to make a complaint. Another citizen, Tom Czarnik (Czarnik) also observed the same near-collision and independently complained to City. He corroborated Anderson's account of the incident and he also wrote a letter. Both witnesses reported that Deegan had made an abrupt lane change without signaling, and then had abruptly braked for no apparent reason, after Anderson honked her horn. Czarnik also observed that Deegan had laughed at Anderson and had "flipped [her] off" yelling obscenities at her as she passed by.

Deegan had been verbally cautioned in 1992 after an anonymous caller complained that he was speeding. While Deegan's supervisor, Chris Summers, was told to counsel Deegan, Summers had never before counseled anyone based on an anonymous telephone call.

*Deegan's Second Informal and Formal Appeal*

City initiated a second *Skelly* proceeding, this time on a notice of intent to terminate. The two *Skelly* proceedings were consolidated. After predisciplinary hearings and informal appeals had been exhausted, Deegan initiated a formal appeal to the appeals board (Board).

The composition of the Board was specified by regulation to include two representatives selected by Deegan and two appointed by City, along with a nonvoting member from the State Department of Industrial Relations, Conciliation and Mediation Service. Both sides were represented by counsel throughout. The Board's hearings spanned seven days of testimony and evidentiary examination, including arguments of counsel, and one day's deliberation. The Board found with respect to the performing arts center incident, that Deegan had used improper language and had shouted at a member of the public and the staff of the center and that he threatened to take action for which he had no legal authority (conduct not becoming a City employee and offensive treatment of the public or fellow employees [violations of § 7.04(1) and (10) of the City's personnel rules]); 2) that Deegan was insubordinate, that he had failed to perform assigned work, and that he had violated safety rules—incidents occurring during May, June and July of 1993; and 3) as to the March 3, 1994, reckless driving incident, that Deegan had engaged in conduct not becoming an employee by driving unsafely and by yelling obscenities at a member of the public and by making an obscene gesture, and that Deegan had misused City property by endangering a City vehicle in the course of hazardous driving.

The Board members found that Deegan had committed all the misconduct alleged, but they were not unanimous on the penalty. As to the performing arts center incident, two of four Board members believed that the discipline of ten days' suspension, demotion and suspension from the City's duty program was not appropriate. As to the penalty of termination for the reckless driving incident, three of four Board members felt it was appropriate.

The Board's findings and recommendations were transmitted to City Manager Kevin Duggan, who on August 11, 1995, issued an order which effectuated Deegan's termination and also imposed the suspension, demotion and removal from the duty program, although the Board had been unable to reach a decision on that question.

*The Superior Court's Findings*

The trial court found that City established by a preponderance of the evidence that Deegan had committed the misconduct as alleged and found by the Board, that is, the reckless driving incident and the performing arts center incident. The trial court disagreed, however, with City's penalty determinations. With respect to the performing arts center incident, the trial court held that since Deegan's conduct occurred while he was off duty, and because there was no legal nexus between his job in the water department

and the incident, that City was without authority to discipline him. With respect to the penalty of termination for the reckless driving incident, the trial court held that City had abused its discretion. The court reasoned that it was the first time that Deegan had engaged in such conduct, that although the potential for harm was great, no one was harmed, and that such conduct was unlikely to reoccur in the future.

## DISCUSSION

### A. *Standard of Review*

, The applicable standards of review at the superior court and appellate court levels differ depending upon which issues are under review. With respect to culpability, i.e., whether Deegan in fact committed the misconduct alleged, the superior court has extensive powers of review. The trial court examines whether the decision of the Administrative Board is supported by the findings and whether the findings are supported by the evidence in the administrative record. (Code Civ. Proc., § 1094.5, subd. (b) (hereafter section 1094.5).) The trial court exercises its independent judgment on the evidence and examines the entire administrative record and reviews evidence both in support of, and in conflict with, the administrative agency's findings. (§ 1094.5, subd. (c); *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143-144 [93 Cal.Rptr. 234, 481 P.2d 242].) The trial court resolves evidentiary conflicts and is required to assess witnesses' credibility and to arrive at its own independent findings of fact. (*Barber, supra,* 45 Cal.App.4th at pp. 658-659.)

Here the trial court exercised its independent judgment and found that Deegan had committed the misconduct alleged against him. Because there were factual and evidentiary conflicts, the superior court's determination of culpability is conclusive and binding on the reviewing court. On appeal, we review the record to determine whether substantial evidence supports the trial court's conclusions, and we resolve all conflicts and indulge all reasonable inferences in favor of the prevailing party. (*Barber, supra,* 45 Cal.App.4th at p. 659.)

With respect to the question of penalty, the superior court's powers of review are quite limited, and are exercised only with great deference to the administrative agency's findings. (*Cummings* v. *Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652 [47 Cal.Rptr.2d 775] (*Cummings*).) Neither the trial court nor the appellate court is entitled to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. (*Ibid.*) The trial court may vacate but not modify the

agency's determination of penalty if it finds a manifest abuse of discretion. (*Ibid.*) The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination. Again, the appellate court reviews the agency's selection of penalty and, if reasonable minds can differ with regard to the propriety of the disciplinary action, it finds no abuse of discretion. (*County of Los Angeles* v. *Civil Service Com.* (1995) 39 Cal.App.4th 620, 634 [46 Cal.Rptr.2d 256].)

## B. *Culpability*

We reiterate that on a petition for writ of administrative mandate, when the superior court has reviewed the evidence and made findings, the role of the appellate court is limited. This limited scope of review requires the appellate court to sustain the superior court's findings if substantial evidence supports them. In reviewing the evidence we resolve all conflicts in favor of the party prevailing in the superior court and give that party the benefit of every reasonable inference. "When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court. [Citation.]" (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

Our review of the record discloses overwhelming evidence supporting the findings of culpability. Also, the findings of culpability by the superior court are clearly conclusive upon this court.

## C. *Penalty*

Having concluded that Deegan in fact committed all the offenses alleged against him, the superior court was then required to uphold City's punishment if there was any reasonable basis for sustaining it. (*Kazensky* v. *City of Merced* (1998) 65 Cal.App.4th 44, 54 [76 Cal.Rptr.2d 356] (*Kazensky*); *County of Los Angeles* v. *Civil Service Com., supra,* 39 Cal.App.4th at p. 634; *West Valley-Mission Community College Dist.* v. *Concepcion* (1993) 16 Cal.App.4th 1766, 1778-1779 [21 Cal.Rptr.2d 5]; *Talmo* v. *Civil Service Com.* (1991) 231 Cal.App.3d 210, 226 [282 Cal.Rptr. 240]; *Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494, 500-501 [210 Cal.Rptr. 788].) As discussed, the penalty imposed by the administrative body will not be disturbed in the mandate proceeding unless a manifest abuse of discretion is shown. (*West Valley-Mission Community College Dist.* v. *Concepcion, supra,* 16 Cal.App.4th at pp. 1778-1779; *Talmo* v. *Civil Service Com., supra,* 231 Cal.App.3d at p. 226; *Schmitt* v. *City of Rialto, supra,* 164 Cal.App.3d at p. 500.) If reasonable minds may differ as to the propriety of the penalty

imposed, there has been no abuse of discretion. (*Lake* v. *Civil Service Commission* (1975) 47 Cal.App.3d 224, 228 [120 Cal.Rptr. 452].) It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown. (*West Valley-Mission Community College Dist.* v. *Concepcion, supra,* 16 Cal.App.4th at p. 1779; *County of Santa Clara* v. *Willis* (1986) 179 Cal.App.3d 1240, 1250-1251 [225 Cal.Rptr. 244].)

The appellate court uses the same standard as the superior court, reviewing the agency's penalty for manifest abuse of discretion. (*West Valley-Mission Community College Dist.* v. *Concepcion, supra,* 16 Cal.App.4th at p. 1779; *Schmitt* v. *City of Rialto, supra,* 164 Cal.App.3d at p. 501.) " 'Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' " (*Cummings, supra,* 40 Cal.App.4th at p. 1652, quoting *Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306].) In this inquiry, the appellate court reviews the agency's selection of penalty for abuse of discretion, and the trial court's determination finding an abuse of discretion or not is not binding on the appellate court. (*Cummings, supra,* 40 Cal.App.4th at p. 1652.) We do not substitute our discretion for that of the administrative agency on the degree of punishment to be imposed. (*Talmo* v. *Civil Service Com., supra,* 231 Cal.App.3d at p. 228; *Barber* v. *State Personnel Bd., supra,* 18 Cal.3d at p. 404.)

The recent case of *Kazensky, supra,* 65 Cal.App.4th 44, is instructive. The primary issue in that case was whether the city abused its discretion in terminating two mechanics, Eugene Kazensky (Kazensky) and Rusty Milleur (Milleur). (*Id.* at p. 48.) Kazensky and Milleur were two of three mechanics selected to work the swing shift from 2:30 p.m. to 11:00 p.m. (*Id.* at pp. 49-50.) The city's idea was that preventive maintenance on vehicles could be done during the swing shift with the least possible inconvenience to users. After vandalism on city vehicles increased considerably, the police suggested instituting electronic surveillance of the city's shop area. (*Id.* at p. 50.)

The city placed a hidden video camera in the shop and it ran from 4:30 p.m. to the end of the swing shift on each of 21 days during a month. There was no videotape of anyone vandalizing city vehicles, but it did record that the three swing shift employees routinely took breaks longer than their two authorized fifteen-minute breaks and the thirty-minute lunch breaks per shift. Milleur was recorded engaging in other misconduct, such as looking through other employees' mail, making copies of their papers, opening sealed envelopes and looking at the contents, etc. (*Kazensky, supra,* 65 Cal.App.4th at p.

50.) One day both Kazensky and Milleur attended a union meeting held at the shop for an hour and one-half. When their boss noticed items on his desk in a different order, he had the hidden camera installed in his office, and it captured Milleur entering his office and looking at papers on his desk for several minutes. (*Ibid.*)

In discussing the standard of review, the *Kazensky* court noted that imposition of the appropriate penalty for misconduct is left to the sound discretion of the agency involved. (*Kazensky, supra,* 65 Cal.App.4th at p. 53.) " 'The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated.' . . . 'Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' . . . [T]his principle of judicial review is that it applies even when the superior court exercises its independent judgment on the evidence . . . in determining whether the agency abused its discretion in finding misconduct." (*Ibid.,* citations omitted.)

Again, neither the trial court nor the appellate court is entitled to substitute its discretion for that of the administrative agency concerning the degree of the punishment imposed. (65 Cal.App.4th at p. 54.) Agencies are vested with high discretion and its abuse must appear very clearly before courts will interfere. "In determining whether an agency abused its discretion in assessing a particular penalty, a court will look to 'whether reasonable minds may differ as to the propriety of a penalty imposed.' (*Lake* v. *Civil Service Commission, supra,* 47 Cal.App.3d at p. 228; [citation].) Judicial interference with the agency's assessment of a penalty 'will only be sanctioned when there is an arbitrary, capricious or patently abusive exercise of discretion by the administrative agency.' [Citation.]" (*Kazensky, supra,* 65 Cal.App.4th at p. 54.)

In *Kazensky,* the superior court found that the city abused its discretion in terminating Kazensky and Milleur. (*Kazensky, supra,* 65 Cal.App.4th at p. 72.) The superior court found that the city was required to use progressive discipline, although there was no applicable written policy in effect at the time. (*Id.* at pp. 72-73.) The director of public works explained his reasoning process in terminating the two employees. He explained that progressive discipline is the policy when feasible. (*Id.* at p. 74.) He believed progressive discipline was not warranted in this case, because the excessive break-taking and theft and falsification of documents (time cards) were not an isolated incident or a momentary thing, but a pattern of behavior. (*Id.* at pp. 74-75.) He had lost trust in the employees, and did not believe that the usual process of progressive discipline would work in changing their behavior. (*Id.* at p. 75.)

The appellate court commented that Kazensky violated a city policy by punching out for Milleur, clearly a dishonest act. (65 Cal.App.4th at p. 76.) The dishonesty, combined with the fact that Kazensky was in charge of a swing shift whose three members spent a great deal of time doing very little, justified the city's decision to terminate him. (*Ibid.*) The termination of Milleur was likewise within the realm of the agency's high discretion. (*Id.* at pp. 76-77.) The judgment of the superior court was reversed.

■   We now review whether the City manifestly abused its discretion in suspending Deegan for the performing arts center incident. The evidence showed that Deegan was rude and abusive to members of the public and members of the staff of the performing arts center. The evidence also showed that this was not the first time that Deegan got into altercations with users of the performing arts center; the TheatreWorks' personnel who interacted with Deegan reported to the staff that this was the same man they had had trouble with before. The evidence also showed that Deegan misrepresented his authority; he told Terri Cranmer of the center that he would have the parked cars towed, and he had no authority to order towing. Such a misrepresentation of authority has been found to be grounds for termination in other cases. (See *Cummings, supra,* 40 Cal.App.4th at p. 1643.)

The evidence also demonstrated that this was but one in a series of incidents during which Deegan was rude to members of the public or other City workers. Clearly, the City water department has an interest in having employees who are able to interact with other employees and the public civilly, if not pleasantly. Deegan's insistence that his need for recreation take precedence over the normal operations of a City department and his interference with that department's contract with a private company, TheatreWorks, constitute failures of good behavior. Temporary suspension for this incident may have been calculated to encourage Deegan to modify his behavior. On the record before us, we find that City did not abuse its discretion in selecting the penalty of suspension, demotion, and suspension from the City's duty program.

The trial court, in reviewing the penalty, decided that City was without authority to discipline Deegan for his off-duty conduct. The trial court applied Government Code section 19572, subdivision (t),[2] which is facially inapplicable to this case since it applies not to City workers like Deegan, but

---

[2]Government Code section 19572 provides: "Each of the following constitutes cause for discipline of an employee, . . . : [¶] . . . [¶] (t) Other failure of good behavior either during or outside duty hours which is of such a nature that it causes discredit to the appointing authority or the person's employment."

to state civil service employees. The statute allows the state to discipline state employees for a failure of good behavior outside of duty hours when the misconduct causes discredit to the state agency or to the person's employment.

Cases applying this statute relating to state workers have determined that a two-pronged test must be satisfied: 1) the misbehavior must cause discredit to the agency; and 2) there must be a rational relationship between the misconduct and the person's employment. (*Vielehr* v. *State Personnel Bd.* (1973) 32 Cal.App.3d 187, 194 [107 Cal.Rptr. 852] [for instance, mere conviction for possessing marijuana off the job has no relationship with the duties of a tax representative trainee such that disciplinary action is clearly appropriate].) There must be a sufficient probative nexus between the failure of good behavior and a finding of discredit to the agency or employment to justify disciplinary action. (*Ibid.*) Whether the conduct occurs on duty or off duty, whether the actor is a state employee or another public employee, the essential test is whether the conduct harms the public service. (*Blake* v. *State Personnel Board* (1972) 25 Cal.App.3d 541, 550-551 [102 Cal.Rptr. 50].) Once the determination is made that the misconduct has occurred, the administrative agency must be shown great deference in its determination of penalty.

It is in this respect that the trial court erred. The trial court agreed with City that the misconduct at the performing arts center had occurred. The trial court did not, however, respect the City's determination that this conduct reflected badly on City and interfered with the public service. The City's determination of the penalty of suspension will be upheld on appeal.

█ With respect to the ruling on the termination of Deegan for the reckless driving incident, the same standard of review applies. The evidence showed that Deegan had previously been reprimanded for reckless driving. (Although it was unusual that the previous reprimand had been based on an anonymous tip, that circumstance does not go to the substance of the matter.) While the Board had found that Deegan had been subject to unusually close supervision, it found the same played no part in the misconduct leading to termination. The trial court disregarded this finding and decided that the pressure Deegan had been under contributed to his extremely reckless driving. Here, Deegan engaged in reckless and dangerous conduct while operating a City vehicle. He had previously been reprimanded for reckless driving. He intentionally terrorized a citizen and placed her in danger. He then humiliated her by laughing at her, making an obscene gesture, and yelling obscenities. All of this occurred on a public highway, witnessed by other citizens.

While the trial court distinguished *Hankla* v. *Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216 [40 Cal.Rptr.2d 583] (*Hankla*), we find that case instructive. That case resulted after Allan Ice (Ice), an off-duty Long Beach police officer, shot and nearly killed the driver of another vehicle following a heated verbal dispute over a trivial driving incident. (*Id.* at p. 1218.) The police department terminated Ice and he appealed to the civil service commission. The civil service commission reinstated Ice and the appellate court found an abuse of discretion. (*Ibid.*)

The facts were that Neil Cramer (Cramer) was driving down the street and suddenly a child riding a bicycle fell into his path. Cramer looked in his side mirror and swerved into the adjoining traffic lane on the left to avoid striking the fallen child. He did not see a car there. (34 Cal.App.4th at p. 1218.) A few minutes later Cramer heard honking behind him and he and his child in the car saw Ice giving them "the finger." (*Id.* at p. 1219.) Cramer gestured back. At the next red light Cramer tried to explain to Ice that he had swerved to avoid a fallen child. Ice was belligerent. Cramer turned to his adult passenger and asked the passenger to find something to use as a weapon. Someone found a hammer which Cramer used in his work as a carpenter. Seeing Cramer turn away, Ice thought he might be reaching for a weapon. Ice reached for his gun which he kept on the seat next to him. He removed the safety and held the gun in his hand. The men were taunting each other. Ice cocked his gun in case the other man had a weapon and then the light turned green. Cramer spat at the passenger side of Ice's car and drove off. (*Ibid.*)

Although Ice saw both of Cramer's hands on the wheel (so he knew Cramer was not holding a weapon) Ice tried to catch up with him by flooring the accelerator. As he did so, the seat which had a loose bracket jerked as the car lurched forward, bringing Ice's gun hand up. Ice tried to engage the gun's safety mechanism while his finger was on the trigger and the gun was pointed toward Cramer. Ice pulled the trigger accidentally and the gun discharged piercing Cramer's left shoulder and lodging in his chest one inch from his heart and one and one-half inches from his aorta. If the bullet had not been deflected by a rib, it would have pierced his heart or aorta and killed him. Cramer then attempted to avoid Ice, since he believed Ice was going to shoot his daughter and his girlfriend, the passengers in the car. Ice never identified himself as a police officer, or apologized, or said that he wanted to help after he had shot Cramer. (34 Cal.App.4th at p. 1220.)

The *Hankla* court noted that in reviewing public employee discipline cases, the court considers the extent to which the employee's conduct resulted in, or if repeated is likely to result in, harm to the public service.

Other relevant factors are the circumstances surrounding the misconduct and the likelihood of its recurrence. (34 Cal.App.4th at pp. 1222-1223.) "The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability." (*Id.* at p. 1223.)

The commission found that Ice unnecessarily engaged in a traffic dispute, that rather than taking evasive action he escalated the dispute, and that he negligently discharged his weapon and wounded Cramer. (*Hankla, supra,* 34 Cal.App.4th at pp. 1224-1225.) The appellate court parted company with the commission in assessing the import of this conduct. (*Id.* at p. 1225.) "It hardly takes an expert to conclude that a reasonable person would not attempt to engage the safety on a hair trigger gun while the gun is pointed at people and while simultaneously flooring the accelerator of a surging vehicle with a loose seat bracket." (*Id.* at pp. 1225-1226.) The court concluded: "Forcing the police department to retain an officer who is unable to handle competently either his emotions or his gun poses too great a threat of harm to the public service to be countenanced." (*Id.* at p. 1226.)

The differences between *Hankla* and this case are differences without distinctions. In *Hankla* the traffic dispute was more protracted. In *Hankla* the potential for harm blossomed into actual harm, while in this case, injury or death was miraculously avoided by the quick thinking and quick driving of the citizen Anderson. This incident involving Deegan was shorter, but the exchange of physical and verbal obscenities was similar. We paraphrase *Hankla*: Forcing City to retain a water worker who is unable to handle competently either his emotions or his five-ton dump truck poses too great a threat of harm to the public service to be countenanced.

Looking to the test enunciated in the seminal case of *Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d 194, the criteria for termination are met. The misconduct here resulted in harm to the public service and, if repeated, would be likely to result in harm to the public service and harm to the public pocketbook. The circumstances were that Deegan was already facing disciplinary proceedings. Given the common thread of Deegan's apparent inability to control his temper, and sometimes his conduct, as evidenced by both the incidents, the likelihood of recurrence would seem fairly high. In sum we find no abuse of discretion on the part of City in imposing the penalty of termination for the reckless driving incident.

DISPOSITION

The judgment of the superior court is reversed. The case is remanded to the superior court, and the superior court is directed to deny Deegan's

petition for writ of administrative mandate and to enter a new judgment in favor of City. Costs are awarded to City.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.