Filed 9/17/25  Doe v. Regents of the U. of Cal. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>   Plaintiff and Appellant,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>   Defendant and Respondent. | 2d Civil No. B331957<br>(Super. Ct. No. 22CV01823)<br>(Santa Barbara County) |

John Doe, a tenured professor in the Department of Geography at the University of California, Santa Barbara (the University), appeals the denial of his petition for writ of mandate. Appellant sought to vacate a decision by the University Chancellor and its Privilege and Tenure Hearing Committee (the Committee) to censure him for his conduct in an authorship dispute with JMK, a graduate student he advised.  He contends the charges were untimely, that the University breached a confidential settlement agreement in his disciplinary hearing and

that the Committee's findings are not supported by substantial evidence. We affirm.

*Facts*

The University's Faculty Code of Conduct provides that a faculty member engages in "unacceptable conduct" and is subject to discipline if the faculty member uses his or her position "to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal reasons." Unacceptable conduct also includes, "Violation of canons of intellectual honesty, such as research misconduct and/or intentional misappropriation of the writings, research, and findings of others."

JMK alleged that appellant, who had been her advisor and the chair of her Ph.D. committee, violated both of these standards when he insisted on being named the first author of an article they wrote together. After a lengthy disciplinary process, including an evidentiary hearing, the Chancellor disciplined appellant by placing a letter of censure in his personnel file for ten years and reducing his salary by 10% for one year.

Appellant's petition for writ of mandate sought to vacate the sanctions. The superior court denied the writ, concluding the disciplinary action was timely and that the Chancellor's and Committee's findings were supported by substantial evidence.

The Authorship Dispute.

As a tenured professor in the Geography Department, appellant's job duties include teaching graduate and undergraduate courses, advising graduate students and directing the Human-Environment Dynamics Lab. Appellant describes his research as being "targeted to improve human health and wellbeing while sustaining the environment on which people depend. A particular focus is building resiliency among the most

2

vulnerable populations in the developing world.  Ongoing collaborative projects in Latin America, Africa, and Asia, examin[e] links among population, health, rural development, agriculture, and marine and forest resource use and conservation . . . ."

JMK earned an M.S. in Environment and Development from the London School of Economics where she authored a thesis entitled, *Conceptualizing Climate Change-Induced Resettlement (CCIR): A Merging of Two Literatures.*  JMK entered UCSB in 2012 to pursue a Ph.D. in Geography.  Appellant sponsored her application for admission and served as her primary advisor and committee chair.

In February 2014, an editor from an academic journal, the *Journal of Earth Science and Climatic Change*, invited appellant to contribute to the journal.  Appellant forwarded the invitation to JMK, asking her to, "Let me know if you might be interested in discussing.  This could be a mini-outlet for some of your MA or PhD work . . . ."

Over spring break in March 2014, JMK wrote a draft commentary entitled, *Climate Change-Resettlement: Where is the Scholarship?*, for submission to the journal.  She named herself as the first author and Prof. Doe as the second.  This draft was "very . . . closely aligned" to JMK's masters thesis.  The idea was hers and it was based on her research and analysis.

After spring break, JMK showed the draft to appellant. Appellant thought it might get published in a more prestigious journal.  They decided to submit the draft to the journal *Nature*, a much more widely distributed and prestigious journal.  *Nature* requires prospective authors to submit through its online portal a cover letter and an abstract or summary of the proposed article.

3

JMK prepared both documents, identifying herself as the first author and appellant as the second. Appellant told JMK that he already had an account with *Nature* that he could use to submit the proposal. She agreed.

Appellant edited the documents and submitted them to *Nature* in April 2014. In doing so, he removed JMK's name from both the cover letter and the abstract. Appellant explained that *Nature*'s portal would only accept one author name and that he believed JMK understood this and agreed to it. JMK was not aware her name had been removed until a few weeks later, when she asked for a copy of the submission.

In May 2014, an editor at *Nature* informed appellant the journal would be interested in publishing a commentary on climate-induced resettlement. JMK was not included on this email but appellant forwarded it to her. Appellant and JMK produced a first draft of their commentary. Appellant sent the draft to *Nature*, copying JMK on the email.

Appellant and JMK continued to revise the article. JMK raised the issue of authorship with appellant on several occasions. He declined to make a final decision on the order in which their names should be listed. JMK believed the *Nature* article was based on her ideas, analysis and writing. She became "increasingly alarm[ed]," and concerned that appellant was not "recognizing [her] contributions to [her] own work."

JMK and appellant submitted the final draft of the article in December 2014, for publication in the January 2015 issue. The printed version of the article listed appellant as the first author and JMK as the second.

JMK believed she had done more than half of the work on the article and continued to press appellant to be listed as the

4

first author.  Appellant "refused to entertain it . . . he stared at me and was very uncomfortable, what felt like a minute, of – of staring at one another, like a staring contest in his office."

Appellant disagreed that they had contributed equally to the article or that it was based on JMK's earlier work.  He described her initial draft as a "literature review," that needed "massive reworking" before it could be published.  Appellant opined that the final piece had "'to be about what's current in the news and what are, you know, policy and governance solutions to this problem.  And then also recommendations for future research – which is a totally different thing.'"  The research relied on in the final article was, in appellant's opinion, "very different" from JMK's master's thesis.  In his view, the final piece "really came from my conceptualization, organization, that I presented to [JMK] and the way to get published" in *Nature*.

Appellant eventually inquired whether *Nature* would consider listing appellant and JMK as "co-first authors."  The *Nature* editor responded that the journal usually listed co-authors of a commentary piece in alphabetical order.

JMK decided that she no longer wanted to work with appellant or have him serve on her doctoral committee.  In mid-December 2014, she informed the department chair and the co-chair of her committee that she needed to transition to a new advisor and committee chair.  In mid-January 2015, after their final draft had been submitted to *Nature,* JMK told appellant that she was switching advisors and wanted him to leave her committee.  After this meeting, appellant again contacted the *Nature* editor, asking whether JMK could be listed as first author.  The editor replied that the issue had already gone to print, so no changes could be made.

The Prior Complaint.  In 2012, another graduate student complained to the then department chair that appellant pressured her to list him as the primary author of an article even though she had the original idea for the research project and performed the majority of the work.  The student also complained that appellant had improperly acted as a reviewer when she attempted to publish the paper.

Before any formal proceedings were held, appellant and the University entered into a settlement agreement.  Appellant also notes that, at the time, he was recovering from a bone marrow transplant and radiation treatment following a relapse of lymphoma.  It provided that the University would not pursue disciplinary charges against appellant if he participated in various levels of supervision.  The agreement also contained a confidentiality provision:  "It is understood and agreed that, by entering into this Agreement, [appellant is] not admitting to any wrongdoing whatsoever and it is understood that [appellant has] specifically denied all of the allegations asserted against [him].  This Agreement shall not be used against [appellant] as evidence of any wrongdoing.  By signing this Agreement, [appellant is] not waiving any defenses that [he] may be entitled to assert in any future disciplinary action.  Similarly, the University is not waiving its right to introduce evidence of the conduct addressed in this Agreement in the event that similar conduct in the future becomes the subject of a disciplinary action."

JMK's Formal Complaint.

In November 2017, JMK joined three other graduate students in filing a formal complaint regarding appellant with the dean of the Graduate Division at UCSB.  This initiated the University's formal disciplinary process.

6

The Bylaws of the Academic Senate govern disciplinary proceedings against faculty members.  Part III, section A(3) of the bylaws provides:  "The Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when it is reported to any academic administrator at the level of department chair or above. . . .  The Chancellor must initiate related disciplinary action by delivering notice of proposed action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation.  There is no limit on the time within which a complainant may report an alleged violation."

JMK met with the then chair of the Geography Department, about the authorship dispute in October 2014.  She remembered telling the chair that she and appellant were working on a commentary for *Nature,* based on her master's thesis, "that he was disagreeing that my name should be first on the paper and that I didn't really know what to do."  The chair advised her to talk with the University ombudsman.

In early 2015, JMK spoke with the department chair and other faculty members about filing a complaint against appellant.  In the summer of 2016, she spoke with the Dean of the Graduate Division about filing a complaint against him.  The Dean interviewed nine current and former students of appellant in September 2016, and concluded that the Graduate Division could not pursue any action without a formal complaint from the affected students.  In November 2017, four students, including JMK, filed a formal complaint regarding appellant with the University Academic Senate.

Disciplinary Process.  The University's procedures for enforcing the Faculty Code of Conduct include both an informal

7

and a formal complaint and resolution process. JMK pursued a formal complaint. Briefly, the University's complaint resolution process includes inquiries by officers of the Academic Senate, opportunities for the accused faculty member to respond in writing to the charges, and an evidentiary hearing. Both the University and the faculty member may be represented by counsel and the Disciplinary Hearing Committee considers both documentary evidence and testimony. The University administration has the burden of proving the allegations by clear and convincing evidence. The hearing must be recorded.

At the conclusion of the hearing, the Committee makes written "findings of fact, conclusions supported by a statement of reasons based on the evidence, and recommendation" for resolution of the complaint. The Chancellor reviews the Committee's written recommendation and the record of the disciplinary hearing and determines whether to adopt the Committee's recommendation.

The Committee's Decision. Here, after an evidentiary hearing, the Disciplinary Hearing Committee found that the University administration had not met its burden to prove by clear and convincing evidence five of the seven allegations made by other students against appellant. It further found, however, that two of JMK's allegations had been established: (1) appellant used his position or powers as a faculty member to coerce JMK's judgment or conscience for arbitrary or personal reasons; and (2) he violated the canons of intellectual honesty by intentionally misappropriating JMK's writings, research or findings.

The Committee concluded that appellant violated the canons of intellectual honesty when he "insisted on being first author on the *Nature* article, which was based on [JMK's]

8

master's thesis and initial manuscript." While appellant contributed to the *Nature* article and was justified in being a co-author of it, "he was not entitled to take ownership of [JMK's] ideas and place himself as first author against her wishes." He exaggerated his contributions to the piece and "attempted to manipulate the submission process" by removing JMK's name and making the initial submission in his own name only.

The Committee also found that appellant used his position of power to coerce JMK's judgment because he pressured JMK to agree that he would be listed as first author even though the article originated from her intellectual work. "[A] graduate student should not have to wrestle with her advisor for control and ownership over a paper and set of ideas that were derived from her own intellectual work."

The Hearing Committee noted that it had considered the 2012 settlement agreement in deciding on its disciplinary recommendations because, "[T]he current violations must be considered within the context of prior mentoring difficulties that resulted in a negotiated agreement in 2012, which mandated corrective action . . . . The current violations indicate that these prior measures were unsuccessful . . . ." It recommended that appellant be disciplined by placing a letter of censure in his personnel file for ten years and by reducing his salary by 10% for one year.

The Request for Reconsideration. Appellant requested that the Hearing Committee reconsider three of its findings: (1) that the *Nature* article was an extension of JMK's draft for the *Journal of Earth Science and Climatic Change*; (2) that appellant had little experience in the subject matter of the *Nature* article and it was based on ideas that originated with JMK; and (3) that

9

JMK performed most of the writing and research and analysis for the *Nature* article. The request was supported by an exhibit purporting to show minimal overlap between the text of the two articles and that "63% of the content of the *Nature* commentary was written by [appellant] along with his heavily editing of JMK's contributions." Appellant also attached many redlined drafts of the article. The Committee did not reconsider its recommendation.

The Chancellor's Decision. The Chancellor accepted the Hearing Committee's findings and recommendations. He also directed the Dean of the Graduate Division to implement "additional measures" to improve appellant's "'mentoring skills, provide better training outcomes for current and future graduate students, and repair harm caused to former students.'"

The Writ Petition. Appellant filed a petition for writ of mandate to direct UCSB to set aside the sanctions against him. He alleged the decision by the Committee and the Chancellor was a prejudicial abuse of discretion and was not supported by substantial evidence. Appellant further alleged the decision was arbitrary and capricious, "in that no reasonable person could conclude that the order that the two co-authors are listed in the commentary article encompasses research misconduct, intentional misappropriation of the writings, research, and findings of others, or violates the canons of intellectual honesty and are not time-barred." The trial court denied the writ.

*Contentions*

Appellant contends the trial court erred because the charges against him were barred by the University's three-year rule. He further contends the University breached the 2012 settlement agreement by entering it into evidence at the hearing.

Appellant contends Chancellor's and the Committee's findings are not supported by the evidence and that the Committee abused its discretion when it denied his request for reconsideration.

*Standard of Review*

We review appellant's challenge to the Chancellor's decision under the same standards as the trial court.  This requires us to determine whether the University proceeded without, or in excess of, its jurisdiction; whether there was a fair administrative hearing and whether there was a prejudicial abuse of discretion.  (Code Civ. Proc., § 1094.5, subds. (a), (b)[1]; *Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 813-814 (*Akella*).)  An agency prejudicially abuses its discretion if it has failed to proceed in the manner required by law, its decision is not supported by its findings or its findings are not supported by the evidence.  (§ 1094.5, subd. (b); *O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1115 (*O'Brien*).)

"'We review the fairness of the administrative proceeding de novo.  [Citation.]  "The statute's requirement of a '"fair trial"' means that there must have been 'a fair administrative hearing.'"'  [Citations.]  Questions of law are also subject to independent judicial review in a mandate proceeding.  [Citation.]"  (*O'Brien, supra*, 92 Cal.App.5th at pp. 1115-1116.)

The Regents of University of California is a constitutionally created statewide administrative agency (Cal. Const., art. IX, § 9) with "quasi-judicial administrative authority to resolve individualized employment disputes, by applying University

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

11

policies to particular cases." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1487 (*Do*).) Like the trial court, we examine the entire administrative record to determine whether the Committee's and the Chancellor's factual findings are supported by substantial evidence. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487.) "We examine all relevant evidence in the administrative record and view that evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment." (*Do, supra,* at p. 1490.)

Appellant has the burden to demonstrate that the Committee and the Chancellor prejudicially abused their discretion by issuing a decision that is not supported by substantial evidence. "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Do, supra,* 216 Cal.App.4th at p. 1490.)

We exercise our independent judgment in reviewing questions of law. (*Akella, supra,* 61 Cal.App.5th at p. 815.) However, because the Regents is a constitutionally created agency, its interpretation of its own policies is entitled to a reasonable degree of judicial deference unless that interpretation is clearly erroneous or unreasonable. (*Do, supra,* 216 Cal.App.4th at p. 1488; *Palmieri v. State Personnel Board* (2018) 28 Cal.App.5th 845, 860.)

*Discussion*

The Three-Year Rule. Appellant contends the disciplinary charges against him were untimely because the Chancellor did not initiate the disciplinary proceeding within three years after

12

JMK reported an alleged violation of the Faculty Code of Conduct to the then chair of the Geography Department. The Committee and the Chancellor found the charges were timely because JMK first alleged that appellant violated the Faculty Code of Conduct in her November 2017 formal complaint. Disciplinary charges were initiated seven months later, in June 2018. We conclude the University reasonably interpreted its Academic Senate Bylaws and that its factual findings are supported by substantial evidence.

The Academic Senate Bylaws provide that the Chancellor must initiate disciplinary proceedings "by delivering notice of proposed action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation." The Chancellor is deemed to have known about an alleged violation of the Faculty Code of Conduct when a "department chair or other administrator receives the allegation."

Here, JMK testified that, in October 2014, she told the department chair about her authorship dispute with appellant and asked for guidance about what to do next. In December 2014, she again met with the chair to notify him that she was going to remove appellant from her committee and choose another advisor. There is no evidence that during either meeting JMK reported that appellant committed misconduct or had violated the Faculty Code of Conduct. JMK first accused him of doing so in her formal complaint, which she and other students filed in November 2017. Seven months later, in June 2018, the University referred disciplinary charges against appellant to the Committee.

The Academic Senate Bylaws expressly state that the three-year period commences when "an alleged violation of the

13

Faculty Code of Conduct . . . is reported . . . ." Thus, the triggering event is "the receipt of a report of an alleged violation, not the receipt of information from which, with the exercise of reasonable diligence, the University could learn of the alleged violation." (*O'Brien, supra,* 92 Cal.App.5th at p. 1118.) Here, substantial evidence establishes that JMK first reported a violation of the Faculty Code of Conduct in her November 2017 formal complaint. The trial court correctly concluded that this event, rather than JMK's October 2014 meeting with the department chair, commenced the three-year period for filing disciplinary charges.

Appellant appears to contend that the three-year period began in October 2014 because the facts JMK related to her department chair described a violation of the Faculty Code of Conduct. But there is no evidence JMK actually made that claim during the meeting. Instead, she testified that she described the authorship dispute and sought guidance on how to resolve it. She did not present detailed allegations of a violation of the Code of Conduct until she filed her written complaint in November 2017. The disciplinary proceeding against appellant was commenced within three years of that date and was, therefore, timely.

Substantial Evidence. Appellant contends the University's findings are not supported by substantial evidence because no reasonable person could conclude the listing of co-authors in alphabetical order violates the canons of intellectual honesty. We are not persuaded.

The administrative record includes substantial evidence that appellant violated the cannons of intellectual honesty during the authorship dispute. First, JMK testified that the *Nature* article was derived from her master's thesis. She revised the

14

thesis, conducted additional research and wrote the first draft of the article, the cover letter and the abstract for submission to *Nature*. JMK also worked on each of the subsequent drafts. Appellant removed JMK's name from the submission to *Nature* without her permission and then declined to credit her with primary authorship.

Appellant testified that JMK's first draft needed "massive reworking." The abstract JMK wrote, which he submitted to *Nature* under his own name, had to be "basically reconceptualize[d] . . . . [T]his *Nature* article really came from my conceptualization, organization, that I presented to [JMK] and the way to get published here." Appellant opined that he was the primary author of the piece because it was the product of his "conception" and he "did more of the work" on it.

Presented with these divergent descriptions of the authorship dispute, the Hearing Committee credited JMK's testimony over appellants. Like the trial court, we conclude this credibility determination was well within the Committee's purview. In assessing whether its decision is supported by substantial evidence, we do not "substitute [our] own findings and inferences for that of the agency." (*Akella, supra*, 61 Cal.App.5th at p. 814.) It is not our role to "'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.'" (*Do, supra*, 216 Cal.App.4th at p. 1492, quoting *Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1293-1294.) JMK's testimony provides substantial evidence to support the Committee's decision.

Appellant next contends no substantial evidence supports the Committee's conclusion that he "used his position or his

15

powers as a faculty member to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal reasons." (Bold omitted.) He denies that he did anything to harm JMK. Instead, he "simply disagreed" with her demand to be named the first author and she benefitted from the publication of the piece in any event. Like the trial court, we conclude the Committee's finding is supported by substantial evidence.

JMK's testimony supports a reasonable inference that appellant used his position of authority and power to coerce her into agreeing to be named the second author of the article, despite her objections. When he removed her name from the initial submission and delayed discussing her demand to be named first author, appellant placed JMK in a position where she had no choice but to acquiesce to his preferred order or risk not being published at all. JMK testified that, as the publication date approached, she was disappointed that appellant refused to discuss listing her as the first author. She felt that she had "exhausted all avenues and that the last remaining avenue would be to write to *Nature*, to our editors, and let them know that we were having . . . a dispute about authorship." JMK did not write to the *Nature* editor because, she "was very concerned that . . . *Nature* would choose not to publish the article . . . at all at that point." JMK was left feeling as if she was "being manipulated" and had been "taken advantage of" by Doe. The Committee was entitled to credit this testimony.

Breach of Settlement Agreement. Appellant contends the University breached the 2012 settlement agreement by using it in the disciplinary hearing. Respondent contends this issue has

16

been forfeited because appellant did not raise it in the writ proceeding below. We agree.

Appellant argued in his writ petition that the 2012 agreement was irrelevant. He did not contend the University breached confidentiality. Because this contention could have been raised in the writ petition, but was not, appellant has forfeited review of it. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.)

If not forfeited, we would reject the contention. The 2012 agreement states that it will be "treated as confidential, . . . consistent with University policies . . . ." In addition, while the agreement stated it "shall not be used against [appellant] as evidence of any wrongdoing," it also provided that, "the University is not waiving its right to introduce evidence of the conduct addressed in this Agreement in the event that similar conduct in the future becomes the subject of a disciplinary action." Academic Senate Bylaw 336(D)(5), provides that, "Prior discipline imposed on the same accused faculty member . . . by negotiation may be admitted into evidence if the prior conduct . . . is relevant to the acts alleged in the current disciplinary matter. Under these conditions, . . . records of negotiated settlements are always admissible." We conclude use of the 2012 agreement in the current disciplinary proceeding was consistent with Bylaw 366, and therefore did not breach the agreement.

Request for Reconsideration. Appellant contends the Committee and the Chancellor abused their discretion when they failed to consider his request for reconsideration of the committee's original findings. The trial court rejected this contention, noting that appellant did not make his request in a

17

timely manner or provide a proper foundation for the documents he submitted. We agree.

On the final day of the disciplinary hearing, the Committee agreed to consider additional redlined versions of the article submitted after the hearing concluded. The Committee's findings and recommendations were issued over seven months later, on June 25, 2021. Appellant did not submit any additional documents during those seven months, first presenting his "meta data analysis" and redlined drafts in August 2021.

Academic Senate Bylaw 366, § D.12 provides that the Disciplinary Hearing Committee "may reconsider a case if either party presents, within a reasonable time after the decision, newly discovered facts or circumstances that might significantly affect the previous decision, and that were not reasonably discoverable at the time of the hearing."

Reconsideration under this bylaw is discretionary, not mandatory. It also requires some showing that the request was made within a reasonable time and is based on "facts or circumstances . . . that were not reasonably discoverable at the time of the hearing." Appellant made neither showing. He did not provide the additional documents to the Committee within a reasonable time after the hearing or after the Committee's decision. In addition to other foundational issues, he also did not explain why these documents, created in 2014 and 2015, were not reasonably discoverable at the time of the hearing. The trial court correctly concluded that the Committee and Chancellor did not abuse their discretion when they declined to reconsider their decision based on these documents. (*Do*, *supra*, 216 Cal.App.4th at p. 1490.)

Excessive Sanctions.  Appellant contends the sanctions were an abuse of the Chancellor's discretion.  Review of this contention has been forfeited because appellant failed to raise it in the trial court.  In any event, we reject it because there was no abuse of discretion.

The University has broad discretion to determine appropriate discipline and its decision in that regard is entitled to deference.  (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 50.)  An abuse of discretion will be shown only in the exceptional case where "'reasonable minds cannot differ on the appropriate penalty.'"  (*Pasos v. Los Angeles County Civil Service Commission* (2020) 52 Cal.App.5th 690, 700.)  We "must uphold the penalty if there is any reasonable basis to sustain it." (*County of Los Angeles v. Civil Service Commission of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877.)

Here, University policy allows for sanctions up to and including the termination of employment.  The sanction imposed on appellant was well within those permitted by University policy.  There was no abuse of discretion.

*Conclusion*

The judgment is affirmed.  Respondent shall recover its costs on appeal.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

CODY, J.

19

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____


Hathaway Parker and Mark M. Hathaway, Jenna E. Parker, for Plaintiff and Appellant.

Nye, Stirling, Hale, Miller & Sweet, and Jonathan D. Miller, Alison M. Bernal, for Defendant and Respondent.