Filed 10/19/15  Mabry-Height v. Cal. State Personnel Bd. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| VICKIE MABRY-HEIGHT, | B253269 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS139300) |
| v. | |
| CALIFORNIA STATE PERSONNEL BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joanne B. O'Donnell and Robert H. O'Brien, Judges.  Affirmed.

Wilton & Associates and Ronald D. Wilton for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Senior Assistant Attorney General, Kenneth C. Jones and Kevin K. Hosn, Deputy Attorneys General, for Defendant, Cross-complainant and Respondent.

_____

## INTRODUCTION

Vickie Mabry-Height, M.D., appeals from a judgment denying her petition for writ of administrative mandamus. By her petition, Dr. Height sought to compel the State Personnel Board to set aside its resolution finding her conduct violated Government Code section 19572 and upholding her dismissal from employment with the California Department of Social Services (CDSS). On appeal, Dr. Height contends the trial court erred in denying her petition because the board's findings are not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *CDSS Disclosure Requirements, Dr. Height's Employment and Her Initial Disclosure of Outside Employment*

The CDSS adopted an Incompatible Activities Statement for its employees pursuant to Government Code section 19990. This section provides in part: "A state officer or employee shall not engage in any employment, activity, or enterprise which is clearly inconsistent, incompatible, in conflict with, or inimical to his or her duties as a state officer or employee." The Incompatible Activities Statement provides employees are responsible for submitting, in writing, a description of *all* outside employment or activities. It also provides, based on Public Contract Code section 10410, an employee is prohibited from contracting on his or her own behalf with a state agency to provide goods or services.

The CDSS's Disability Determination Services Division (DDSD), Los Angeles West Branch,[1] hired Dr. Height as a Medical Consultant I in 2004. Her position required

---

[1]     Throughout this opinion, relevant branch offices of the DDSD are referred to by their branch name alone, e.g., Los Angeles West Branch, La Jolla Branch, Stockton Branch.

her to review and interpret medical evidence submitted by physicians to assist the DDSD in determining claimants' eligibility for disability benefits under several government programs, including Social Security.

At the commencement of her employment, Dr. Height was provided with CDSS Publication 228, which sets forth the CDSS' Incompatible Activities Statement and provides instructions for completing a required certification form regarding an employee's outside activities. Publication 228 defines outside employment and activities as services performed by a CDSS employee on the employee's own time for which the employee may or may not receive compensation.

The Publication 228 Certification form requires an employee to check one of three boxes regarding the employee's outside employment and/or activities: Category A if the employee has "no outside employment and/or activities"; Category B if the employee has "employment and/or activities that do not deal with CDSS such as" retail, restaurant, crafts, or ranching; or Category C if the employee has "employment and/or activities that may be related to CDSS such as" working in a group home, counseling, contracting with the state, day care, or medical examinations/reviews. The Certification form also states: "I understand that by signing this certification I declare that I shall submit, in writing, a description of any and all outside activities and/or outside employment as referenced in Category B or C . . . within thirty (30) calendar days and, further declare that I will submit, in writing, any and all changes relative to Category B or C . . . within thirty (30) calendar days. [¶] I understand that failure to abide by this policy statement may result in disciplinary action."

At the time Dr. Height started working for the DDSD, she was a part-time employee and she had her own private practice in internal medicine. In March 2005, she completed a Publication 228 Certification form in which she disclosed the existence of her private practice. She checked Category B and wrote on the form that she had outside employment as a physician, which involved "examination & treatment of my private patients in my office—20+ hours per week—patients have nothing to do with [C]DSS." Dr. Height never received any response to this form from CDSS.

3

**B.** *Dr. Height's Subsequent Disclosures of Outside Employment*

Three years later, on February 26, 2008, after Dr. Height had become a full-time employee of the DDSD, Dr. Height signed a second Publication 228 Certification form. On the form, Dr. Height checked Category A indicating she had "no outside employment and/or activities."

On March 13, 2008, Dr. Height completed an annual California Form 700 Statement of Economic Interests (Form 700) covering calendar year 2007. Form 700 requires disclosure of earned income from business entities other than the CDSS.

Prior to filling out the Form 700, Dr. Height asked her immediate supervisor about it. Dr. Height's supervisor instructed Dr. Height she would "just have to read the form." Dr. Height turned to other medical consultants and inquired of them how they were filling out the form. According to Dr. Height, those doctors indicated to her they had nothing to report because none of their outside clinical work "had anything to do with CDSS."[2] Dr. Height stated through the Form 700 she had "[n]o reportable interests on any schedule."

Dr. Height next completed and signed a Form 700 for calendar year 2009 on April 13, 2010.[3] Again, Dr. Height indicated on the form she had "[n]o reportable interests on any schedule."

For calendar year 2010, Dr. Height disclosed her private medical practice with income "not from CDSS" of $10,001 to $100,000 per year on a Form 700 she signed March 30, 2011. On an attachment to the form[4] Dr. Height indicated she did "not feel

---

[2]    Dr. Height identified a number of physicians with whom she spoke. Two of the physicians were called to testify during the hearing. Both physicians denied they had any conversation with Dr. Height about Form 700s.

[3]    There is no Form 700 for calendar year 2008 in the record before us.

[4]    The attachment appears to have been created by CDSS and intended for its records as it references the Incompatible Activities Statement and the Publication 228 Certification form.

4

[her] disclosures [were] a conflict of interest" because "[t]he business entity disclosed has not provided any services to any State of California agency on a regular basis and was not paid any money from the State of California from 01/01/2010 to 12/31/2010." (Capitalization omitted.)

Dr. Height also completed a Publication 228 Certification form on March 30, 2011. On the form, she selected Category B reflecting she had outside employment that does not involve the CDSS. Dr. Height disclosed she was the sole proprietor of Vickie Mabry Height, M.D. She explained in the form she "evaluate[s] and/or treat[s] individuals."[5]

## C. *Dr. Height's Outside Employment While Employed by DDSD*

Throughout her employment with DDSD, Dr. Height maintained her private medical practice. She also worked for a number of other entities.

Dr. Height had active outside employment in 2008 with the California Medical Board and the Registry of Physician Specialists. Dr. Height reviewed medical records and rendered opinions for the California Medical Board. Through the registry, Dr. Height was assigned to the California Department of Corrections and Rehabilitation to provide medical services to 51 inmates over the course of a three-day period in June and July.

During part of 2009 and 2010, Dr. Height was employed by Kaiser Permanente. She worked in its hospital and as an on-call physician. Dr. Height could not recall but did not think she did any work for the California Medical Board or the Registry of Physician Specialists in 2009.

In December 2010, Dr. Height completed one medical evaluation for the Stockton Branch. Dr. Height received this assignment through the La Jolla Branch. Dr. Height

---

[5]  Both 2011 forms were completed and signed after the DDSD conducted an investigative interview of Dr. Height concerning her outside employment on February 24, 2011.

5

applied to be on the panel of physicians to whom the La Jolla Branch referred cases for consultative evaluations in 2008.[6] Dr. Height received $153 for the evaluation in January 2011.

Dr. Height also completed two consultative evaluations for the La Jolla Branch in December 2010. Dr. Height received $291 for the evaluations in January 2011.

In January 2011, Dr. Height performed another consultative evaluation for the Stockton Branch and two for the La Jolla Branch. Dr. Height received $424 for her services.

### D. *The Investigative Interview*

In late 2010, Dr. Height's medical office received an appointment to perform a consultative examination for the Los Angeles North Branch and attempted to reschedule it. One of the staff members of that branch recognized Dr. Height as an employee of the Los Angeles West Branch and reported the situation to her supervisor. As a result, the DDSD conducted an investigative interview of Dr. Height on February 24, 2011.

In the interview, Dr. Height was asked about any outside employment she had engaged in since 2008. Dr. Height stated that she had worked at her own office, Kaiser Permanente, and possibly for the medical board. She did not disclose that she had worked for the Department of Corrections and Rehabilitation through the Registry of Physician Specialists. She denied that she had done any work for state agencies. She did not acknowledge having performed consultative examinations for the CDSS until after she was directly asked about such work.

### E. *The Notice of Adverse Action*

On May 18, 2011, the CDSS served Dr. Height with a Notice of Adverse Action (NOAA). The DDSD immediately placed Dr. Height on administrative time off from her

---

[6] Consultative examinations are performed by private doctors who independently contract with the CDSS to provide medical examinations.

position as a Medical Consultant I, and she was dismissed from her position effective May 31.

According to the NOAA, the CDSS took the action against Dr. Height for insubordination, willful disobedience, dishonesty, and other failure of good behavior all in violation of Government Code section 19572, subdivisions (e), (f), (*o*) and (t). The NOAA alleged Dr. Height had engaged in outside employment without reporting it or seeking permission to do so,[7] provided "vague, incomplete and non-responsive" answers when questioned about the matter in the investigatory interview, climbed up on the furniture to remove a fluorescent light bulb after being instructed to wait for the safety coordinator, and failed to log into the office computer system for an average of 40 hours per week.[8]

## F. *Appeal to the Board*

Dr. Height filed her appeal to the board on June 5, 2011. She stated she disagreed with the decision to dismiss her because: "The charges against me are fabricated, without foundation, and defamatory." In addition, she claimed she was terminated in retaliation for prior protected activities, including a whistle-blowing complaint; complaints of race, gender, and age discrimination; complaints about retaliation; questioning why some employees were treated differently; a work-related injury; a complaint about refusal to accommodate a medical condition under the Americans with Disabilities Act; and a current discrimination claim against the California Department of Corrections and Rehabilitation.

---

[7] The NOAA specifically referred to Dr. Height's February 26, 2008 Publication 228 Certification form and her Form 700s dated March 13, 2008 and April 13, 2010.

[8] Ultimately, charges of insubordination for climbing on the desk were found unsupported as was the claim Dr. Height was not working sufficient hours. These claims are not otherwise discussed.

**G.** *The Administrative Hearing*

The board's administrative law judge (ALJ) heard Dr. Height's appeal over the course of six days in January, February and March 2012. On May 9, 2012, the ALJ issued a proposed decision upholding Dr. Height's dismissal.

1. *Supervisor Awareness of Outside Employment*

Dr. Height testified her supervisors were aware of her private medical practice even without the required written disclosures. According to Dr. Height, in 2006, she discussed her private practice with Rosie Montoto, the Los Angeles West Branch Chief, in the process of becoming a full-time employee. Dr. Height testified she told Montoto she would need to work four 10-hour days because she still had her own practice in which she saw patients on Fridays and Saturdays.

Montoto, however, testified otherwise. According to Montoto, she did not know of Dr. Height's private practice until 2010. At that time, Montoto learned of Dr. Height's consultative examination activities (when Dr. Height's office attempted to reschedule the Los Angeles North Branch examination) and found Dr. Height's website. Montoto testified when she had the discussion with Dr. Height about becoming a full-time employee in 2006, she recalled Dr. Height's reason for wanting Fridays off had something to do with her commute.[9]

Montoto testified she was aware that other medical consultants had private practices. She testified Publication 228 Certification forms and Form 700s are placed in the employees' personnel files and forms are reviewed later "[o]nly if there is an issue with it. It's an honor system."

---

[9] An email communication from Dr. Height to Montoto memorialized the conversation. The email, however, did not refer to Dr. Height's medical practice. Instead, the email referenced Dr. Height's need for a certain schedule due to "other commitments."

Dr. Height's immediate supervisor in January 2008, Mimi Allas testified that she never had a conversation with Dr. Height regarding outside employment and conducting consultative examinations outside of Los Angeles. Allas acknowledged, at some point, she thought Dr. Height "had a medical practice elsewhere" because "she always [seemed to] have commitments on Fridays afternoons." Additionally, one of Allas' staff members reported to her that when he was in a state office, he saw Dr. Height's name "on the board, which gave him the impression that she was employed there." Allas believed she reported this to her supervisor. Allas did not recall whether there was any investigation of the issue.[10]

2. *Dr. Height's Contract With the La Jolla Branch*

Dr. Height testified she was on the panel of physicians performing consultative examinations for the Los Angeles West Branch when she was first hired as a Medical Consultant I in 2004. She had been on the panel for the Los Angeles West Branch since 1988. Dr. Height stopped conducting consultative examinations after she was hired in 2004, because the examination work was in Los Angeles County.

---

[10] In January 2008, Allas wrote to Personnel Analyst Sharry Covington regarding problems she was having with Dr. Height. These included "ongoing problems with her Production/work and her attendance," and using up her Family Medical Leave Act time for "a medical condition." In addition, Allas reported, "Whenever she is in the office, she is seen making calls from her cell phone, faxing some documents which may not be work related . . . and she usually steps out of the office for an hour to several hours at a time . . . lending some suspicions that she is attending to some personal business. In May 2007, I found a certification (not work related) that she had faxed in our fax machine which states that she is a 'Medical Director, Medical and Compensation Consultant[].'"

Allas asked, "Is there a way by which the State can find out whether she is engaged in another work—especially while claiming sick time? Apparently, she has a consultancy service that is taking so much time from her job with our Department. She also has 'commitments' on Friday afternoons . . . looks like she has a medical practice elsewhere."

Allas did not recall any response to her communication to Covington.

Dr. Height testified after she was working for the DDSD, in 2008, "What I did was my [Culver City] office had been moved and I was going into Riverside County, so it was—in my mind, it was outside of the jurisdiction of Social Services. And my team manager had confirmed that for me." Dr. Height reasoned she was already on the physician panel for performing consultative examinations, so she asked if she could update her address for purposes of serving on the panel. She provided her updated information to the La Jolla Branch.[11]

Dr. Height testified, "It was my understanding that if I submitted the information . . . to update my address and I was outside of Los Angeles County, and what I was doing had nothing to do with LA West, that there was no problem with that." Dr. Height stated she did not "know at that time that I was—doing all this that I had to get permission from anyone to do that. Because, again, I had always been on this panel. I was just updating my information. And actually, in my mind, I was outside of LA County, and LA West had nothing to do with what I would be doing in my private practice and in another county."

Dr. Height also explained she did not disclose to the Los Angeles West Branch she was performing consultative examinations "[p]rimarily because it was on the resume that I sent to [the La Jolla Branch office] . . . . And unfortunately, at that time I didn't remember some statement that I had signed that's been shown to me repeatedly from February of 2008 that said I was supposed to get permission. I didn't have any thoughts of that. And I didn't feel like I was hiding or not disclosing anything, because it's the same agency." She later added, "I also wasn't approving my own contract. So in my mind, if there was any problem, the person approving the contract would have said, you know, Dr. Height, you work for CDSS in LA. We can't approve your contract. And that didn't happen."

---

11    The form Dr. Height submitted to update her address was a physician panel application.

10

Dr. Height believed she disclosed her employment with the DDSD to the La Jolla Branch by attaching her curriculum vitae to her panel application. Dr. Height testified she told Donna Shoots of the La Jolla Branch she was primarily interested in working in her area of Rancho Mirage in Riverside County.

Shoots, however, disputed knowing Dr. Height was employed by the Los Angeles West Branch. Shoots testified Dr. Height contacted her and filled out an application to be on the panel for the La Jolla Branch. Shoots spoke to Dr. Height on the telephone and Dr. Height told Shoots she was a consultant in Los Angeles. According to Shoots, Dr. Height never mentioned the Los Angeles West Branch. To Shoots, working for the Los Angeles West Branch and performing consultative examinations for the La Jolla Branch was a conflict of interest and unethical. In such a situation, Shoots would have inquired of Dr. Height whether she had upper management's permission to conduct the consultative examinations for the La Jolla Branch. Shoots also would have spoken to others in her office about Dr. Height's circumstances and consultative examination assignments for the La Jolla Branch.

### 3. *Credibility Determination*

The ALJ made credibility findings because Dr. Height's testimony on certain issues conflicted with that of other witnesses. The ALJ found Dr. Height's testimony overall was not credible and in some respects fabricated. The ALJ noted Dr. Height "was often evasive in her testimony" and described Dr. Height's testimony on certain issues as attempting to "split hairs" instead of answering questions directly and honestly.

The ALJ did not believe Dr. Height's assertion she had no conflicts of interest with her outside employment. Dr. Height alleged because each office worked only on cases from its own geographic region, and she had not performed any consultative examinations for the Los Angeles West Branch or the Los Angeles North Branch, there was no conflict of interest. The ALJ found Dr. Height's own experience belied such a claim. Dr. Height had performed consultative examinations on Stockton Branch cases assigned to her by the La Jolla Branch. Dr. Height also had some of her cases transferred

11

to New York, and she knew that cases were transferred among the DDSD branch offices to even out the workload.

The ALJ also did not believe Dr. Height's claim she did not understand some of the questions at her investigative interview or did not have the opportunity to explain her answers. She had a friend and her union representative with her; the interview lasted two hours and two breaks were taken; and Dr. Height "demonstrated that she is a highly intelligent, capable, and knowledgeable person. [Her] claimed misunderstanding of the conflict of interest forms and the 700 forms was a fabrication."

4. *Findings of Dishonesty, Willful Disobedience, and Failure of Good Behavior*

The ALJ found Dr. Height guilty of dishonesty in failing to report her outside employment in violation of Government Code section 19572, subdivision (f). First, she "willfully omitted the fact that she had maintained a medical practice in 2007" when she signed the Publication 228 Certification form on February 26, 2008, and she "willfully omitted that she maintained a business position or earned income from her medical practice" on her March 13, 2008 and April 13, 2010 Form 700s.

Second, Dr. Height "willfully omitted that she was employed as a Medical Consultant for [C]DSS when she applied to the La Jolla [B]ranch . . . of DDSD because she knew that [C]DSS's Incompatible Activities Statement prohibited such work." She also failed to inform her supervisors she was doing consultative examinations although she knew by virtue of the Publication 228 Certification form she had an affirmative duty to make such disclosure.

Third, Dr. Height's statement on her March 30, 2011 Form 700 that she did not have a conflict of interest because she had not provided services to a state agency on a regular basis "conveniently ignored the fact that in December 2010 she entered into five contracts with [C]DSS to conduct consultative examinations, and her husband/office

12

manager had solicited additional work on her behalf." Her statement on the form was "just a blatant example of sophistry."[12]

The ALJ also found Dr. Height's actions constituted willful disobedience in violation of Government Code section 19572, subdivision (*o*), and other failure of good behavior in violation of subdivision (t) of that section.

The ALJ concluded dismissal was an appropriate penalty for Dr. Height's actions. Dr. Height actively sought outside work knowing, at a minimum, it had to be disclosed, and it likely constituted a conflict of interest. She "demonstrated no understanding" of the policies behind the Incompatible Activities Statement "and evaded taking any responsibility for her actions." Such factors made it likely her dishonesty would recur and made dismissal an appropriate penalty.

## H. *The Board's Resolution*

On June 5, 2012, the board considered the ALJ's findings of fact, determination of issues, and proposed decision. It adopted these as its decision.

## I. *The Petition for Writ of Administrative Mandate*

Dr. Height filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5)[13] on September 4, 2012. Dr. Height claimed the board abused its discretion in upholding her dismissal because neither the findings nor the decision was supported by substantial evidence. She also claimed the board ignored the evidence she was the victim of discrimination.

---

[12]    As noted earlier, the ALJ rejected a charge of dishonesty based on the falsification of time sheets. The ALJ also rejected a charge of insubordination based on the incident in which Dr. Height stood on her desk to try to remove the light.

[13]    All further statutory references are to the Code of Civil Procedure unless otherwise noted.

On September 20, 2013, the trial court denied the petition and entered judgment in favor of the CDSS. The court rejected Dr. Height's argument there was no evidence "she affirmatively knew she was improperly concealing various outside employment" from the CDSS. It noted she did not challenge the findings she had been trained as to the disclosure requirements, her outside employment constituted a conflicting activity, and she failed to report her outside employment. The court also rejected her claim of an "honestly-held but mistaken subjective belief" in light of the ALJ's determination she was not a credible witness. The court found the credibility determination was supported by substantial evidence in light of Dr. Height's "high level of education," "the fairly non-complex nature" of the Incompatible Activities Statement, Dr. Height's training on ethics issues, "and the relatively self-explanatory nature of the forms." The court concluded, "In the absence of a finding of mistake, there is substantial evidence that supports the determination of willfulness. Therefore, there are no grounds to issue a writ with respect to the first two causes of discipline," dishonesty and willful disobedience.

The court also rejected Dr. Height's challenges to the finding of failure of good behavior based on the evidence of her willful concealment of her outside employment. It rejected as well her challenges to the penalty imposed, noting her attack on the penalty was primarily a reiteration of her attack on the findings regarding her conduct. The court therefore found no basis to issue a writ.

**DISCUSSION**

A. *Standard of Review*

"Trial court review of an administrative decision is governed by . . . section 1094.5. Subdivision (b) [thereof] limits the court's inquiry 'to the questions whether the [administrative tribunal] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' In determining whether there was an abuse of discretion, the reviewing court considers whether the administrative tribunal proceeded in the manner required by law, whether

14

its order or decision is supported by the findings, and whether the findings are supported by the evidence.  [Citation.]

"Because the [State Personnel Board] is vested with quasi-judicial powers, the trial court may not exercise its independent judgment, but must uphold the [b]oard's findings if they are supported by substantial evidence.  In applying the substantial evidence test, the trial court must examine all relevant evidence in the entire record, considering both the evidence that supports the [b]oard's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence.  [Citations.]  This does not mean, however, that a court is to reweigh the evidence; rather, all presumptions are indulged and conflicts resolved in favor of the [b]oard's decision.  [Citation.]

"These standards 'do not change on appellate review from a trial court's denial of a petition for writ of mandate from a decision of the [State Personnel Board]; an appellate court independently determines whether substantial evidence supports the [State Personnel Board's] findings, not the trial court's conclusions.'  [Citation.] However, insofar as an appeal from an administrative mandamus proceeding presents questions of law, our review is de novo.  [Citation.]"  (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, italics omitted; see also *Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 742.)

## B.  *There Is Substantial Evidence of Dishonesty*

Dr. Height's contention substantial evidence does not support the finding of dishonesty amounts to little more than an invitation to reweigh the evidence and make a finding contrary to that of the ALJ.  This we cannot do.  (*Telish v. State Personnel Bd.*, *supra*, 234 Cal.App.4th at p. 1487; *Natalie D. v. State Dept. of Health Care Services* (2013) 217 Cal.App.4th 1449, 1455; *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1328-1329.)

Dishonesty under Government Code section 19572, subdivision (f), "connotes a disposition to deceive."  (*Gee v. Cal. State Personnel Bd.* (1970) 5 Cal.App.3d 713,

15

718.)  "It '"denotes an absence of integrity; a disposition to cheat, deceive, or defraud . . . ."'" (*Id.* at p. 719, quoting *Hogg v. Real Estate Comr.* (1942) 54 Cal.App.2d 712, 717.)  The board has further clarified dishonesty as "an intentional misrepresentation of known facts, or a willful omission of pertinent facts . . . ." (*Haji Jameel* (2005) SPB Dec. No. 05-02 at p. 17, fn. 23.)

It is undisputed Dr. Height engaged in outside employment throughout her tenure with the CDSS.  Dr. Height maintained her private medical practice during all of her years with the CDSS.  In 2008, she reviewed medical records and rendered opinions for the California Medical Board.  She also conducted 51 examinations of inmates over the course of three days for the state's Department of Corrections and Rehabilitation through the Registry of Physician Specialists.  In 2009, Dr. Height worked for Kaiser Permanente.  In late 2010 and early 2011, Dr. Height contracted with the La Jolla Branch and performed six consultative examinations.

It is also undisputed after Dr. Height's initial disclosure of her private practice in her March 2005 Publication 228 Certification form (the first form she signed), Dr. Height did not again disclose the private medical practice until 2011 after the investigative interview.  Dr. Height did not disclose any of her outside employment, including her practice, in her February 2008 Publication 228 Certification form, her March 2008 Form 700 or her April 2010 Form 700.  In fact, Dr. Height affirmatively represented on those forms she had "no outside employment and/or activities" or "[n]o reportable interests on any schedule."  She made such representations even though she had an ongoing practice she previously disclosed to the CDSS in 2005.

Dr. Height contends she was not dishonest because she did not have the requisite intent to deceive and points to evidence she argues shows she "did not attempt to hide her part-time work from the CDSS."  Dr. Height relies on her March 2005 Publication 228 Certification form disclosing her private practice, her website, Allas' belief Dr. Height was working outside the office, Allas' internal inquiry whether an investigation of Dr. Height's outside activities could be undertaken, Allas' receipt of information Dr.

16

Height was employed at another state office and Kaiser Permanente's request for information from the CDSS regarding Dr. Height's work application in 2009.

The evidence Dr. Height relies on, however, does not show any affirmative and open acts taken by Dr. Height disclosing her outside employment to the CDSS from 2008 to 2011. Substantial evidence supports a finding from February 28, 2008, when Dr. Height represented she had no outside employment, until the investigative interview on February 24, 2011, Dr. Height did not reveal to the CDSS through her actions she was engaged in outside employment. Dr. Height's after-the-fact reliance on her supervisor's suspicions does not support the notion Dr. Height "did not attempt to hide her part-time work from the CDSS." Dr. Height's supervisor's beliefs have little, if anything, to do with what Dr. Height intended.

The ALJ had evidence before her contrary to Dr. Height's assertion she "did not attempt to hide" her outside employment. Allas had her suspicions about Dr. Height's outside employment based on Dr. Height's in-office behavior which Allas believed was inconsistent with her work at the DDSD. Allas reported Dr. Height was making calls from her cell phone and faxing documents while at the office. She also reported that Dr. Height would step out of the office for up to several hours at a time. The ALJ could have reasonably concluded the actions described by Allas were, in fact, acts designed to conceal Dr. Height's outside employment while at work at the Los Angeles West Branch.

Moreover, there is no evidence Dr. Height knew Allas had suspicions Dr. Height had outside employment or had asked for an internal investigation into it. Allas testified she never had a conversation with Dr. Height regarding outside employment including conducting consultative examinations outside of Los Angeles. There is no evidence Dr. Height knew Kaiser Permanente had actually contacted the CDSS about her.

CDSS Publication 228 required Dr. Height to disclose all outside employment and activities whether Dr. Height believed such employment or activities were related to the CDSS. That her supervisors at the Los Angeles West Branch could have discerned

17

Dr. Height had outside employment does not negate the existence of substantial evidence Dr. Height knew she was required to make the disclosures and failed to do so.

Dr. Height also challenges the ALJ's finding the required disclosure paperwork provided clear instructions to the employees. She asserts "the paperwork simply does not support this conclusion."

Dr. Height's claim there is ambiguity in the forms[14] does not negate the ALJ's finding Dr. Height was "a highly intelligent, capable, and knowledgeable person," and her "claimed misunderstanding of the conflict of interest forms and the 700 forms was a fabrication." Facts before the ALJ supported this conclusion. Dr. Height reported her business on her initial Publication 228 Certification form in 2005 and thereafter affirmatively represented in February 2008 she had no outside employment. Throughout 2008, 2009 and 2010, Dr. Height did not comply with clear instructions on the certification form to advise in writing of any change in her outside employment status within 30 days. After the investigative interview in 2011 when Dr. Height learned her certification forms were being examined, Dr. Height then completed a certification form reflecting her private practice.

With regard to the Form 700s, Dr. Height contends an ambiguity in the instructions led to a misunderstanding and a mistake. The evidence reveals the allegedly misleading written instructions were not provided to Dr. Height until March 7,

---

[14]    Assuming the CDSS instruction form provided to Dr. Height to assist her in filling out the Form 700 was ambiguous, Publication 228 and the certification form do not appear to suffer from a similar ambiguity. Publication 228 clearly defines outside employment as "any partnership, ownership or services performed by a department employee on his/her own time, during other than normal working hours, for which he/she may or may not receive any form of compensation." Category A on the corresponding certification form states, "I have no outside employment and/or activities." Thus, Category A employees are those who engage in no work outside of the CDSS. If an employee believes his/her outside employment is not related to the CDSS, the employee would select Category B declaring that he/she has "employment and/or activities that do not deal with CDSS." An employee who has outside employment must disclose it either through Category B or C.

18

2011. Thus, any ambiguity could not have affected Dr. Height's 2008 or 2009 Form 700. Moreover, despite the claimed ambiguity and no assistance from the CDSS other than the instructions given by it, Dr. Height reported her private practice on the March 30, 2011 Form 700. Again, this disclosure occurred after the investigative interview in February 2011 when Dr. Height learned the CDSS was investigating her outside employment.[15]

Dr. Height also complains the ALJ and the board held her to a higher standard, a "knowledgeable doctor," in finding intent to deceive and willful disobedience. She is incorrect. She was not held to a higher standard; the ALJ and the board did not make the determination "whether a 'knowledgeable and intelligent doctor' would be able to navigate the labyrinth of the various instructions and fine print on the subject forms when requested assistance from her superiors is denied." Rather, the ALJ and the board considered Dr. Height's intelligence and education in determining whether, *in fact*, she misunderstood the forms she filled out or whether, *in fact*, she willfully failed to disclose information she knew had to be disclosed in order to deceive her employer as to her outside employment and contracts with the state. She cites no authority supporting a conclusion the ALJ and the board erred in relying on such factors.

Dr. Height argues it is "important to note that any perceived dishonesty on [her] part must be viewed in the context of the fact that CDSS never even read or reviewed the forms it claims were dishonestly completed" until after the NOAA. She does not explain how the fact her dishonesty was not discovered earlier has any effect on the determination that she was, in fact, dishonest in filling out the forms and her lack of compliance with the CDSS' Incompatible Activities Statement.

---

[15]     In addition, the ALJ reasonably could find Dr. Height's question and request for a list of business entities of the type that must be reported, made *after* the investigative interview and Dr. Height's awareness that her reporting was being investigated, was an attempt to avoid liability for her failure to report rather than reflective of honest confusion about how to fill out the form.

19

Dr. Height also suggests we should reject the ALJ's credibility determination as arbitrary and lacking a rational basis. She argues "there is nothing in the record to contradict [her] explanations concerning completion of the disclosure forms." Further, "[t]he mere fact that multiple other Medical Consultants employed by CDSS acted in the same fashion as [Dr. Height] and apparently interpreted the disclosure forms the same way atomizes any claim that [she] acted with an intent to deceive. Otherwise, nearly every Medical Consultant at CDSS is a liar, but only [Dr. Height] was singled out for dismissal."

First, the trier of fact "may reject any evidence as unworthy of credence, even uncontradicted testimony." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979; accord, *Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.) "'A witness may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story.' [Citation.]" (*Bassett Unified School Dist. v. Commission on Professional Competence* (1988) 201 Cal.App.3d 1444, 1451.) We cannot overturn the trier of fact's determination unless "the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Shaw*, *supra*, at p. 279, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.)

The contradiction of Dr. Height's testimony by other witnesses and her demeanor while testifying provided the ALJ with a rational basis for rejecting her testimony. (See, e.g., *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1502 [rejecting challenge to trial court's credibility determination based on witness's misstatements and changing testimony when confronted with contrary facts]; *Fuller v. Fuller* (1979) 89 Cal.App.3d 405, 410 [refusing to overturn finding on credibility where other evidence supported a conclusion witness was untruthful].) The ALJ could also disbelieve her testimony on the

20

ground it was "inherently improbable."[16] (*Bassett Unified School Dist. v. Commission on Professional Competence*, *supra*, 201 Cal.App.3d at p. 1452.) Because Dr. Height's testimony was not uncontradicted and unimpeached, and there was a basis for finding her not to be a credible witness, we will not overturn the ALJ's credibility determination. (*Shaw v. County of Santa Cruz*, *supra*, 170 Cal.App.4th at p. 279.)

Second, there is no evidence regarding the extent of the medical practices of the other Medical Consultants whose Form 700s Dr. Height submitted as evidence. Thus, we have no basis for determining whether they interpreted the forms in the same manner she did, or whether "nearly every Medical Consultant at CDSS is a liar."[17]

Finally, Dr. Height notes that in 2011 she was paid $848 for the six consultative examinations she performed. She claims "[i]t defies logic to conclude, as the ALJ did, that [she] would intentionally risk her $12,000 per month salary, plus benefits and pension, for $848.00." Dr. Height could not have known, however, when she applied to be on the physician panel of the La Jolla Branch she would receive only $848 for six consultative examinations. In fact, after she was placed on the physician panel, her husband/office manager contacted the La Jolla Branch requesting she receive more referrals. Dr. Height also changed her specialty on the panel from nephrology to internist in an effort to generate more work.

Substantial evidence supports the ALJ's finding Dr. Height was not a credible witness and the board's determination she was guilty of dishonesty.

---

[16] For example, the ALJ could have reasonably concluded it was inherently improbable Dr. Height was confused when she indicated on her Publication 228 Certification form in 2008 she had no outside employment.

[17] We similarly have no evidence as to the ethnicity of the other Medical Consultants and so cannot consider their Form 700s "as evidence of disparate treatment because [Dr. Height] was treated differently than other Medical Consultants similarly situated who were not African-American and were not disciplined."

**C.** *There Is Substantial Evidence of Willful Disobedience*

Dr. Height argues the finding of willful disobedience "suffers from the same fatal defects as the conclusion she was dishonest." Willful disobedience within the meaning of Government Code section 19572, subdivision (*o*), "connotes a specific violation of [a] command or prohibition." (*Coomes v. State Personnel Board* (1963) 215 Cal.App.2d 770, 775.) "Thus, in order to justify disciplinary action under . . . subdivision [(*o*)] of section 19572, [the board] findings must rest upon evidence of intentional or knowing conduct. Evidence which fails to establish willfulness, knowledge or intent lacks an indispensable element for proof of guilt and is not substantial." (*Ibid.*) Dr. Height claims "there is no substantial evidence that [she] willfully violated any specific command or prohibition."

Dr. Height complains the obligation to report her outside activities was found "in the small print on the Publication 228 Certification form," and her supervisors never discussed with her how to fill out the form. She challenges the CDSS' "position that [she] was required to remember the 30-day requirement from a single small-print sentence contained on a form she signed on February 26, 2008, and that she 'knew' of the obligation because she took the Public Service Ethics Education course on March 13, 2008."[18] She claims "this scant evidence hardly constitutes a specific violation of a command or prohibition or willfulness, knowledge, or intent. It would be absurd to interpret the small print language on the Certification and attendance at the Public Service Ethics Education as constituting the type of 'command' described in Government Code [section] 19572[, subdivision (*o*),] to justify discipline, let alone dismissal." (Italics omitted.)

---

[18] On March 13, 2008, Dr. Height completed an online Public Service Ethics Education course. The course included information regarding "[l]aws relating to personal financial gain by public servants," conflict of interest laws, and general principles of ethics for public employees. Dr. Height signed a Proof of Participation Certificate certifying she "fully reviewed the content of the entire online . . . course approved by the Attorney General and Fair Political Practices Commission . . . ."

Dr. Height is incorrect the certification form was the only location where CDSS employees were advised of their ongoing disclosure obligations. Publication 228 expressly sets forth the requirement for employees "who are engaged in or wish to engage in any employment or activity that falls into 'Category B or C' as indicated on the certification . . . [to] submit a written description of the specifics . . . ." Publication 228 further instructs CDSS notification is required prior to engaging the outside activity: "This notification shall be made prior to engaging in the outside employment and/or activity so that a determination can be made by the Personnel Officer with review by legal staff as to the permissibility of the employment and/or activity."

Moreover, in connection with her claim there was no substantial evidence of dishonesty, Dr. Height relied upon evidence she disclosed her private practice in her March 2005 Publication 228 Certification form. That she understood the instructions for filling out the form perfectly well in 2005 supports a finding of willful disobedience in filling out the form in 2008, when she omitted any reference to her private practice.

Dr. Height also argues the ALJ could not rely on evidence she lied in her investigative interview, because "there was no accurate evidence in the record of what actually occurred during the Interview." Dennis Campos, Team Manager for the Los Angeles North Branch of the DDSD, who conducted the February 24, 2011 investigative interview, testified either he or his supervisor, Cynthia Herrera, refused to allow the interview to be recorded. He received the questions he was to ask Dr. Height in advance of the interview, and after the interview he placed the list of questions in a container for shredding.

Herrera's notes of what transpired during the investigative interview were introduced into evidence at the hearing before the ALJ, as were Dr. Height's notes as to her recollection of the interview. Campos and Dr. Height also testified concerning the interview.

Dr. Height cites no authority for the proposition that notes and recollection of an interview do not constitute substantial evidence of what was said during the interview. To the extent there were discrepancies between Dr. Height's recollection and that of

Campos and Herrera, the ALJ could consider the refusal to allow recording of the interview and the shredding of the questions as affecting the credibility and the weight of the testimony of Campos and Herrera. (Cf. *People v. Fauber* (1992) 2 Cal.4th 792, 828-830 [prosecution's failure to record interview with witness did not require suppression of the interview, and evidence of what occurred "was available through the testimony of persons present during the interview"].)

Dr. Height further relies on the fact "multiple CDSS Medical Consultants maintained outside practices or employment and did not disclose those activities on the Form 700 . . . , [and] none of them were disciplined." She asserts that "[e]ither all of them were recalcitrant or [Dr. Height's] apparently erroneous reading of the requirements is one shared by many and therefore not willful disobedience." Again, we have no information concerning their practices, so we cannot determine from their forms whether Dr. Height was one of many who were misled by the language of the forms or whether she was singled out for punishment. It is significant to note Dr. Height did not include in the record their Publication 228 Certification forms, on which they were required to indicate outside employment whether it was a reportable interest on the Form 700. Neither is there testimony by any of these other medical consultants that he or she was misled by the language of Form 700.

We conclude there is substantial evidence of Dr. Height's willful disobedience.

**D.  *There Is Substantial Evidence of Other Failure of Good Behavior***

Under subdivision (t) of Government Code section 19572, a person may be punished for "[o]ther failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment." "There must be more than a failure of good behavior before the board may discipline an employee under [Government Code] section 19572, subdivision (t). The misconduct must be of such a nature as to reflect upon the employee's job. In other words, the 'misconduct must bear some rational relationship to his employment and must be of such character that it can easily result in the impairment or disruption of the

24

public service. [Citations.] The legislative purpose behind subdivision (t) was to discipline conduct which *can be detrimental* to state service. [Citations.] It is apparent the Legislature was concerned with punishing behavior which had *potentially destructive consequences*.' [Citation.] The Legislature did not intend '"... to endow the employing agency with the power to dismiss any employee whose personal, private conduct incurred its disapproval."' [Citation.]" (*Yancey v. Sate Personnel Bd.* (1985) 167 Cal.App.3d 478, 483.)

Dr. Height contends the conduct she "was accused of committing, failing to have properly completed the disclosure forms, falls well below the type of misconduct required to substantiate a violation of this subsection." Again, she is improperly viewing the evidence in the light most favorable to her own position, not in the light most favorable to the board's determination, as we are required to do.

Dr. Height was not accused of failing to complete disclosure forms properly. She was accused and found guilty of dishonesty and willful disobedience in failing to disclose outside employment and potential conflicts of interest when she knew she had an affirmative duty to make such disclosures. She failed to comply with the CDSS' Incompatible Activities Statement. Moreover, she "willfully omitted that she was employed as a Medical Consultant for [C]DSS when she applied to the La Jolla [B]ranch . . . of DDSD because she knew that [C]DSS's Incompatible Activities Statement prohibited such work." In other words, she took actions designed to conceal her activities and potential conflicts of interest from her employer and the state in order to be able to get additional money from the state by contracting with it, in clear violation of the Incompatible Activities Statement adopted pursuant to Government Code section 19990 and disclosure requirements.

As explained by the ALJ, Dr. Height's actions undermined the Incompatible Activities Statement and impaired public service. The ALJ noted the policy underlying the disclosure requirements "is to protect the public from state employees who may have a conflict of interest because of their need to serve two masters, i.e., their state employer and their private business interests. The proscription against conflicts of interest

25

recognizes the fact that an impairment of impartial judgment can occur in even the most well-meaning person when his or her personal economic interests are affected by the business they transact on behalf of the government. (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569.) When a state department is prevented from determining if an employee's activities are incompatible with his or her duties as a state employee because the employee has not made truthful disclosures, there is an impairment of the public service."

Also, the record indicates the Los Angeles West Branch already had other concerns about impairment of public service due to Dr. Height's outside employment. In 2008, Allas expressed concern over "ongoing problems with [Dr. Height's] Production/work and her attendance," using work time and state resources for her personal business, and using sick time for outside employment. Later, when her supervisors continued to have concerns over the amount of time Dr. Height seemed to disappear during the work day, they checked their computer system records which showed that from December 2010 through March 2011, there were significant periods of time in which she was supposed to be working but was not logged on to her computer.

We conclude there is substantial evidence of "[o]ther failure of good behavior . . . which is of such a nature that it causes discredit to" CDSS. (Gov. Code, § 19572, subd. (t).) Substantial evidence also supports a determination that Dr. Height's conduct resulted in an impairment to public service.

### E. *Dismissal Was an Appropriate Penalty*

Dr. Height in essence contends because the board's findings are not supported by substantial evidence and because she was guilty, at most, of filling out the disclosure forms improperly, dismissal was not the appropriate penalty for her. Rather, less severe penalties would be sufficient to prevent the recurrence of her improper conduct. As explained, her contention rests on a faulty premise that the board's findings are not supported by substantial evidence.

We review the determination as to the appropriate penalty for abuse of discretion. (*County of Santa Cruz v. Civil Service Commission of Santa Cruz* (2009) 171 Cal.App.4th 1577, 1581-1582; *Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46-47.) "'In considering whether [abuse of discretion] occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence.' [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability. [Citation.]" (*County of Santa Cruz*, *supra*, at p. 1582.) Discretion is abused if the findings made are inconsistent with the penalty imposed. (*Id.* at p. 1584.)

However, so long as there is a reasonable basis for the penalty imposed, then we will not disturb the board's determination. (*Deegan v. City of Mountain View*, *supra*, 72 Cal.App.4th at pp. 46-47.) "'"Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed."'" [Citation.]" (*Id.* at p. 47.)

The findings made here are supported by substantial evidence, and they are consistent with the penalty imposed. Dr. Height deliberately violated the policies behind the Incompatible Activities Statement "and evaded taking any responsibility for her actions," even at the hearing on the NOAA. As the ALJ concluded, this made it likely her dishonesty would recur and made dismissal an appropriate penalty. Accordingly, we find no abuse of discretion.

27

## DISPOSITION

The judgment is affirmed.  The board is awarded its costs on appeal.

BECKLOFF, J.[*]

We concur:

PERLUSS, P. J.

SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.