Filed 4/10/25  Welch v. City of Yreka CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| RYAN WELCH, | C099721 |
| Plaintiff and Respondent, | (Super. Ct. No. SCSCCVPT2021944) |
| v. | |
| CITY OF YREKA, | |
| Defendant and Appellant. | |

Ryan Welch (Welch) was an officer with the Yreka Police Department (the Department).  He was terminated for violating various provisions of the Yreka Police Department Policy Manual (Manual).[1]  Welch appealed to the City Council.  The City Council conducted a hearing and found the Department established the violations by a

---

[1] Further undesignated section references are to the Manual.

1

preponderance of the evidence. The City Council also found the termination was warranted.

Welch filed a petition for writ of mandate seeking to overturn the termination. The trial court granted the petition, finding the City Council's findings were not supported by the evidence. That being so, the trial court concluded the termination was an abuse of discretion. The trial court thus issued a writ of mandamus reversing the termination and suggesting that any discipline be consistent with the court's ruling.

Following remand, the City Council again found the Department established the allegations by a preponderance of the evidence and termination was warranted. The City of Yreka (City) now appeals from the judgment granting the petition for writ of mandate, arguing the trial court erred in finding the City Council's findings were not supported by the evidence. We will affirm.

## I. BACKGROUND

Welch joined the Department in February 2016. He served without significant incident until May 29, 2019, when he responded to a service call regarding an as yet unidentified individual causing a disturbance at a municipal maintenance yard.

### A. Service Call at the Maintenance Yard

Welch pulled into the yard and saw four maintenance workers standing near a bicycle. He immediately approached the bicycle, produced a pocketknife, and "popped" the bicycle's front and back tires. He then spoke with the maintenance workers in the yard.

Two of the workers told Welch they had run an errand earlier in the day and saw a man with a bicycle on the highway. When they returned, they saw the same man steering the bicycle into the maintenance yard. The chain on the bicycle broke, and the individual slammed the bike to the ground. The man started screaming and yelling, and throwing tent stakes and rocks the size of softballs at nearby buildings. The man eventually left the yard, leaving the bicycle behind. He walked along the fence line towards an adjacent

2

creek and greenway, and soon disappeared from view. However, he continued throwing rocks over the fence for some period of time, hitting one or more buildings. By the time Welch arrived, the man was gone.

Welch spoke briefly with the workers. They said the man had not threatened them, and they did not seem to be afraid. However, one of the workers had apparently armed himself with a crowbar or pipe.

Welch could not hear screaming or yelling coming from the man's direction of travel. He did not follow the man towards the creek or greenway. He asked several times whether any of the buildings had been damaged and was repeatedly told they were not. He did not personally inspect the buildings or take photographs of them. Nor did he collect physical evidence (such as the bicycle, tent stakes, or rocks) or take witness statements. Instead, he brought the service call to a conclusion as quickly as possible. As Welch would later explain, he was embarrassed by the fact that he had popped the bicycle tires, believed there was no need for further investigation, and hoped the entire episode would simply "go away." It did not.

B.      *First Internal Affairs Investigation*

One of the maintenance workers was dissatisfied with Welch's response to the call for service and complained to the Director of Public Works. The worker believed Welch should have done more to investigate the individual in the yard that day and should have followed him into the creek and greenway areas.[2] The Director of Public Works called then-Chief of Police David Gamache. Gamache ordered an internal affairs investigation.

The investigation was conducted by Sergeant Raymond Boutin. Boutin was tasked with determining whether Welch violated any of the following provisions of the

---

[2] The maintenance worker was not concerned about the popping of the bicycle tires.

3

Manual:  (1) section 318.5.1(c), which reaches violations of federal, state, or local laws;[3] (2) section 318.5.3(a), which reaches neglect of duty; and (3) section 318.5.5(m), which reaches conduct unbecoming a member of the Department.[4]

Boutin visited the maintenance yard and recovered the bicycle, which was still there, weeks later.  The bicycle tires were flat.  Boutin tried to locate puncture marks attributable to Welch but was unable to do so as the tires were "loaded with goat heads."[5]  Boutin did not book the bicycle into evidence.

Boutin spoke with maintenance workers and inspected the buildings said to have been struck by rocks.  Boutin observed minor damage, but nothing serious.  Boutin also spoke with Welch.  Welch acknowledged popping the bicycle tires, adding "he immediately knew it was a mistake and he felt bad about that and shouldn't have done that."  Welch explained he did not inspect the buildings because "no one seemed concerned" about possible damage to them.  He did not follow the man into the creek and greenway areas because he believed him to be "long gone."

---

[3]  Specifically, section 318.5(c) addresses:  "Violation of federal, state, local or administrative laws, rules or regulations."

[4]  Section 318.5.5(m) addresses:  "Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members."

[5]  "Goat heads" appear to be a type of thorny weed.  (See University of California Agriculture and Natural Resources, Statewide Integrated Pest Management Program, "Puncturevine (*Tribulus terrestris*)," <https://ipm.ucanr.edu/PMG/WEEDS/puncturevine.html> [as of Apr. 3, 2025], archived at: <https://perma.cc/F9YP-B4TR> ["Puncturevine or goathead is a prostrate, summer annual, mat-forming, broadleaf plant with an extensive root system.  Listed as a 'C-rated' noxious weed in California, puncturevine produces many burs with sharp spines that can injure humans and animals, as well as puncture bicycle tires"].)

Boutin reported the results of his investigation to Lieutenant Chris Betts. Betts told Boutin he thought Welch was lying and directed him to re-interview Welch, focusing on possible criminal conduct involving the bicycle tires. Boutin interviewed Welch again. As before, Welch acknowledged popping the bicycle tires, describing the action as "an immediate mistake," which he knew to be "wrong." Asked to define "vandalism," Welch correctly did so. However, Welch was not asked to characterize the popping of bicycle tires as vandalism or any other criminal conduct. Asked whether he would do anything differently next time, Welch said he would not pop the bicycle tires, but would inspect the buildings for damage and take witness statements. He would also consider asking another unit for assistance in pursuing the man.

Betts reviewed the investigation reports and prepared a memorandum to Gamache sustaining the allegations and opining that Welch committed vandalism in violation of section 318.5.1(c) of the Manual and Penal Code section 594, subdivision (a). Betts also opined that Welch neglected his duties and engaged in conduct unbecoming a member of the Department in violation of sections 318.5.3(a) and 318.5.5(m), respectively.

C.      *Requests for Trial by Declaration*

Meanwhile, another problem was brewing. Members of the Department are expected to testify in court proceedings from time to time. Their testimony may be presented by declaration in some cases. (See generally Veh. Code, § 40902 [authorizing trials by declaration for traffic infractions].) In such cases, the member may receive a Judicial Council form entitled "Request for Trial by Written Declaration." The request attaches a form declaration and includes instructions for completing and returning the form by a specified date. Welch received two such requests for two separate traffic citations. He failed to respond to them, resulting in dismissal of both cases.

D.      *Second Internal Investigation*

Another internal investigation was ordered. The second investigation sought to determine whether Welch neglected his duty within the meaning of section 318.5.3 of the

Manual.  As before, Boutin was assigned to investigate.  Welch explained he did not regularly check his department mailbox (where the requests had been sent), but instead relied on the "court board" for court appearances.  He also said he had never been asked to respond to a request for trial by declaration before.

Boutin reported the results of his investigation to Betts.  Betts prepared another memorandum to Gamache.  Betts again found Welch's conduct amounted to neglect of duties within the meaning of section 318.5.3(a) of the Manual.

E.    *Termination*

Gamache issued a notice of intent to terminate in June 2020.  The notice proposed to terminate Welch for: (1) neglecting his duties by failing to investigate the incident at the maintenance yard and failing to respond to the requests for trial by declaration; (2) engaging in conduct unbecoming a member of the Department by failing to investigate and popping the bicycle tires; and (3) violating state law (specifically, Penal Code section 594, subdivision (a)) by popping the bicycle tires.

A *Skelly* hearing was held on August 5, 2020.  (See *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.)  During the hearing, Welch acknowledged popping the bicycle tires, and agreed the action reflected poorly on himself and the Department.  He also acknowledged "drop[ping] the ball" on the requests for trial by declaration.  Asked whether he could guarantee that similar conduct would not occur in the future, Welch explained he would soon be leaving the Department due to an injury, and added, "there's not much I can really say to [ensure] that it's not going to happen again, because I'm, I'm out of the game.  I mean, I, I can't come back.  I'm, I'm not going to be able—you know, I'll never be back to, to do that again.  It's just not in my cards.  So if I, if I was better, if I wasn't a [gimp,] I mean, it would be, it would be different.  I'd be telling you how it would never happen again, that was a one-time thing, but I can't."  Gamache issued a notice of termination later that day.

*F.*     *Appeal to the City Council*

Welch appealed the termination to the City Council.  A hearing was held, at which witnesses testified as described above.  Gamache also testified about his reasons for terminating Welch.

Gamache explained the Department generally follows a progressive discipline policy, whereby discipline begins with a written reprimand or documented verbal counseling and progresses to suspension and termination.  However, the Department is not required to use progressive discipline and can start with more serious discipline for conduct amounting to "enough of an infraction."  Ultimately, Gamache said, the degree of discipline depends on the seriousness of the violation and likelihood of recurrence.  When asked why he believed termination was appropriate here, Gamache indicated he was influenced by two considerations:  (1) Welch's "admissions" of wrongdoing in the internal investigations; and (2) Welch's inability to guarantee similar wrongdoing would not recur in the future.  We will have more to say about each of these considerations momentarily.

Gamache went on to testify that there has been an evolution in law enforcement's attitudes towards the homeless population over the years.  In the 1990s, Gamache said, members of the Department would sweep homeless encampments near Yreka Creek once a year, discarding or burning any property left behind.  Now, Gamache said, "we literally can't touch homeless property or homeless encampments."  Gamache testified the new policy has been communicated to all members of the Department.

Gamache also made several concessions.  First, he acknowledged that other members of the Department had failed to respond to requests for trial by declaration, but Welch was the only one who had ever been terminated for doing so.  Second, Gamache acknowledged that Welch expressed remorse for his behavior and said he would do things differently if he could.  The only reason Welch could not guarantee the behavior would not recur was that he was leaving the Department, and thus would not have an

7

opportunity to restore his reputation. Finally, Gamache acknowledged that members of the Department exercise wide discretion in responding to calls for service. In responding to a vandalism call, Gamache said, the member may or may not prepare a police report, inspect for damage, or attempt to locate a suspect. Thus, Gamache allowed, Welch had discretion whether to take a report, walk the fence line, or inspect the buildings for damage.

Boutin testified about the internal investigations. He opined that Welch was appropriately remorseful during the investigations, and said he believed him to be sincere. However, Boutin recalled that Betts thought Welch was lying about the incident in the maintenance yard and seemed to want to catch him in a lie. Boutin testified he told Betts he thought Welch was sincere and continued to believe as much. He also testified he had heard of other members of the Department destroying property belonging to homeless people. Specifically, Boutin said he had heard members talking about "big winds" that damaged or destroyed homeless encampments near Yreka Creek. Boutin indicated he understood "big winds" to refer to the deliberate destruction of homeless encampments or property belonging to homeless people.

Welch, for his part, testified he had been having a bad day when he responded to the maintenance yard. He believed the man causing the disturbance was likely homeless, and Welch had grown frustrated by his dealings with homeless people. Welch explained that members of the Department sometimes destroy property belonging to homeless people. According to Welch, members sometimes go into homeless encampments and pull tents down and break tent rods. They cut lines from which tarps are hung or cut holes in tents or tarps. They throw rocks through the windows of abandoned trailers and throw tents off the bridge into Yreka Creek. Asked about "winds blowing through the creek," Welch responded: "Basically like the winds was, you know, we're going to walk through there, and that's kind of when everyone's tents got pulled over or the tarps got cut or that kind of stuff."

Welch testified that other members of the Department have popped the tires of homeless people's bicycles, and he himself had popped tires on one or two previous occasions. Indeed, Welch said popping tires used to be an accepted practice within the Department and only became a problem around the time of his internal investigation. Since then, Welch said, "I've learned, and everybody else learned bike tires are off limits. They weren't off limits before. Now they are." All the same, Welch felt "immediate regret" upon popping the bicycle tires in the maintenance yard that day. When asked whether he "damaged the bike tires" and committed "an act of vandalism," Welch responded with one-word, affirmative answers ("Yes" and "Correct"). As for the requests for trial by declaration, Welch admitted he had been lax in checking his mailbox.

A former member of the Department, whose service coincided with that of Gamache, Betts, and Welch, testified that he had seen members destroy homeless people's property "numerous times," and participated in such conduct himself. For example, the former member recalled seeing Betts throw a homeless person's machete into Yreka Creek. He also recalled hearing someone say, " 'every once in a while it gets awfully windy down in the creek.' " The former member understood the speaker to be joking about members destroying homeless encampments and tossing homeless property into Yreka Creek. Gamache and Betts were present when the remark was made and laughed.

On recall, Gamache reiterated that destruction of property belonging to the homeless was common in the early 1990s, but not anymore. He then suggested there had been no destruction of homeless property since he became Chief of Police two or three years earlier. He denied being present when jokes were made about "big winds" in Yreka Creek.

The City Council, sitting as the Personnel Board, rendered its decision on Welch's appeal from termination on May 28, 2021. The City Council made three relevant findings. First, the City Council found Welch violated section 318.5.1(c)—violation of

9

state law—by popping the bicycle tires. According to the City Council, it was "undisputed" that Welch vandalized the bicycle in violation of Penal Code section 594, subdivision (a). Thus, the City Council found the violation of section 318.5.1(c) of the Manual had been established by a preponderance of the evidence. The City Council further found Welch "told Chief Gamache that he could not guarantee he would refrain from repeating this act of vandalism in the future."

Second, the City Council found Welch violated section 318.5.3(a)—neglect of duty—"by not pursuing a criminal suspect, not investigating a crime, not collecting evidence, not collecting witness statements, not responding to court documents, and not attending mandatory court hearings." Although acknowledging that "police officers are vested with some discretion in responding to calls," the City Council said, "when responding to calls that an irate person has damaged property, they are expected to perform at least some law enforcement functions beyond simply responding to the scene." The City Council found Welch failed to take witness statements, failed to survey the maintenance yard to assess damage to the buildings, failed to collect evidence, pursue the suspect, or claim the bicycle as found property. The City Council also found Welch failed to respond to the requests for trial by declaration. Accordingly, the City Council concluded the violation of section 318.5.3(a) had also been established by a preponderance of the evidence.

Third, the City Council found Welch violated section 318.5.5(m)—conduct unbecoming—by "vandalizing a citizen's property, failing to adequately respond to service calls, and disregarding court-related obligations." That violation, the City Council said, was established by the fact that Welch "admitted his behavior looked bad for him, the Department, and the City, and there was no justification for the destruction of the bike tires." Accordingly, the City Council found the violation of section 318.5.5(m) had also been established by a preponderance of the evidence.

10

The City Council next considered the appropriateness of the discipline imposed, focusing on the "[t]he extent of harm to the public resulting from the employee's conduct," and "[t]he likelihood that the conduct, if repeated, would result in such harm." The City Council determined termination was appropriate, based on the alleged vandalism and Welch's supposed admission "to Chief Gamache that he may very well violate this Department's policies in the future."

## G.     The Trial Court's Findings

The trial court independently reviewed the administrative record and determined that none of the City Council's findings of violations of the Manual were supported by substantial evidence. The trial court began with the alleged violation of section 318.5.1(c), which was predicated on the theory that Welch committed vandalism by popping the bicycle tires. After observing that damage to personal property is an element of misdemeanor vandalism (Pen. Code, § 594, subd. (a)), the trial court noted Boutin had been unable to locate any damage attributable to Welch, as the bicycle tires were " 'loaded' with goat heads." The trial court found Boutin to be "extremely credible" and "the most unbiased and credible person involved in the internal affairs investigation and hearing." The trial court also found Welch to be credible. By contrast, the trial court found Gamache was not credible in two respects. First, the trial court found noncredible Gamache's testimony that Welch "slashed" the bicycle tires, given that Boutin was the only officer who inspected the tires, and he was unable to locate any evidence of "slashing." Second, the trial court found Gamache was not credible when he testified Welch could not guarantee the misconduct would not recur. Based on the trial court's independent evaluation of the evidence, and resolution of the conflicting testimony between Boutin and Welch, on the one hand, and Gamache, on the other, the court found "there was no evidence that Welch damaged the bicycle," and therefore, no evidence he violated section 318.5.1(c).

11

The trial court next considered the alleged violation of section 318.5.3(a). Reasoning by analogy to Government Code section 19572, the trial court concluded the Department was required to show Welch acted intentionally, designedly, and without lawful excuse in failing to investigate and failing to respond to the requests for declaration.[6] The trial court found there was no evidence that Welch acted intentionally and without lawful excuse in failing to investigate or respond. Accordingly, the trial court found the evidence was insufficient to support the finding of neglect of duty.

The trial court then turned to the alleged violation of section 318.5.5(m). Relying on *Cranston v. City of Richmond* (1985) 40 Cal.3d 755 (*Cranston*), the trial court explained that "conduct unbecoming" a police officer refers to "conduct which indicates a *lack of fitness* to perform the functions of a police officer." (*Id.* at p. 769.) Although the trial court acknowledged that "Welch's actions were unwise" and "improper," the court found "the attempted disabling of an already disabled and abandoned bicycle . . . does not make Welch unfit to serve as a police officer." Accordingly, the trial court found the evidence was also insufficient to support the finding of conduct unbecoming.

Having determined that none of the alleged violations were supported by substantial evidence, the trial court next concluded termination was an abuse of discretion. Accordingly, the trial court reversed the termination and remanded to the City Council "suggesting that any discipline be consistent with this ruling." As noted, the City Council again found Welch violated the Manual and upheld the termination. This appeal timely followed.

---

[6] Government Code section 19572 sets forth causes for discipline for state employees including "[i]nexcusable neglect of duty." (Gov. Code, § 19572, subd. (d).)

12

## II.  DISCUSSION

### A.  *Standard of Review*

Code of Civil Procedure section 1094.5 provides for judicial review of administrative orders or decisions.  A petition for writ of administrative mandate presents the question of whether the agency or tribunal that issued the challenged decision "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion."  (Code Civ. Proc., § 1094.5, subd. (b).)  "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (*Ibid.*)

Several standards of review are relevant here.  (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45 (*Deegan*) ["The applicable standards of review at the superior court and appellate court levels differ depending upon which issues are under review"].)  The City Council's findings as to culpability (i.e., whether Welch committed the alleged violations) required the trial court to exercise its independent judgment upon the evidence.  (*Ibid*.)  "The independent judgment test required the trial court to not only examine the administrative record for errors of law, but also exercise its independent judgment upon the evidence in a limited trial de novo.  [Citation.]  The trial court was permitted to draw its own reasonable inferences from the evidence and make its own credibility determinations.  [Citation.]  At the same time, it had to afford a strong presumption of correctness to the administrative findings and require the challenging party to demonstrate that such findings were contrary to the weight of the evidence."  (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407 (*Candari*).)

On appeal, we review the record and determine whether the trial court's culpability findings are supported by substantial evidence.  (*Candari, supra*, 193 Cal.App.4th at p. 408; *Deegan, supra*, 72 Cal.App.4th at p. 45.)  "We resolve all

13

evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citation.] 'Where the evidence supports more than one reasonable inference, we are not at liberty to substitute our deductions for those of the trial court.' " (*Candari, supra*, at pp. 407-408; see *Deegan, supra*, at p. 45 [where there are factual and evidentiary conflicts, "the superior court's determination of culpability is conclusive and binding on the reviewing court"].) "Further, we cannot reweigh the evidence. Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court." (*Duarte v. State Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 384.) "Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value." (*Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052.) If substantial evidence exists in the record to support the trial court's judgment, we must affirm. (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512.)

A different standard of review applies to questions of penalty. (*Deegan, supra*, 72 Cal.App.4th at p. 45.) "With respect to the question of penalty, the superior court's powers are quite limited, and are exercised only with great deference to the administrative agency's findings." (*Ibid.*) "Neither the trial court nor the appellate court is entitled to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Ibid.*) "The appellate court conducts a de novo review of the penalty assessed, giving no deference to the trial court's determination. Again, the appellate court reviews the agency's selection of penalty and, if reasonable minds can differ with regard to the propriety of the disciplinary action, it finds no abuse of discretion." (*Id.* at p. 46.) "It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." (*Id.* at p. 47.)

The City raises three arguments on appeal. First, the City argues the trial court applied the wrong standards of review. Second, the City argues the trial court's culpability findings are contrary to the evidence. Third, the City argues the trial court erred in finding the termination amounted to an abuse of discretion. We will address each argument in turn.

B.       *The Trial Court Properly Applied the Appropriate Standards of Review*

The City asserts the trial court applied the wrong standards of review. However, the trial court applied an independent judgment standard to the City Council's culpability findings, and an abuse of discretion standard to the City Council's penalty decision. The City does not seriously argue either standard was incorrect or incorrectly applied. Instead, the City argues the trial court should not have considered the City Council's culpability findings at all. This argument may be more accurately described as a challenge to the scope of the trial court's review, rather than the standard of review. Regardless, the challenge fails.

According to the City, the underlying facts were " 'virtually undisputed,' " and the only question before the trial court was whether the penalty of termination was appropriate. The City takes an overly expansive view of the undisputed facts. It is undisputed that Welch popped bicycle tires and failed to respond to requests for trial by declaration. But admitting these things does not mean Welch admitted any alleged violation of the Manual. That Welch admitted popping bicycle tires does not amount to an admission of vandalism within the meaning of Penal Code section 594, subdivision (a) or a violation of section 318.5.1(c) of the Manual. That he admitted failing to investigate or respond to requests for trial by declaration does not mean he admitted any neglect of duty within the meaning of section 318.5.3(a). The trial court could accept as undisputed that Welch popped bicycle tires and failed to respond to requests for trial by declaration and still conclude the City failed to establish any alleged violation of the Manual by a preponderance of the evidence. Indeed, that appears to be precisely what happened, as

15

we will elaborate.  For the moment, we need only observe that the trial court exercised independent judgment in reviewing the City Council's culpability findings, while reviewing the City Council's selection of penalty for abuse of discretion.  The trial court applied the correct standards of review.  (*Deegan, supra*, 72 Cal.App.4th at p. 45.)

C.      *Substantial Evidence Supports the Finding that the City Failed to Establish a Violation of the Law*

The City Council found the Department proved by a preponderance of the evidence that Welch violated section 318.5.1(c), violation of state law, by vandalizing a bicycle in violation of Penal Code section 594, subdivision (a).  The trial court independently reviewed the administrative record, including Boutin's internal investigation reports, and determined the evidence was not sufficient to support the finding that Welch damaged the bicycle.  From this premise, the trial court reasoned the evidence was also insufficient to support the finding that Welch violated Penal Code section 594, subdivision (a) or section 318.5.1(c) of the Manual.  Substantial evidence supports the trial court's determinations.

Section 318.5.1(c) prohibits violations of federal, state, local, or administrative laws, rules, or regulations by members of the Department.  The alleged violation of section 318.5.1(c) was based on Penal Code section 594, subdivision (a).  Penal Code section 594, subdivision (a) provides:  "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of  vandalism: [¶]  (1) Defaces with graffiti or other inscribed material.  [¶]  (2) Damages.  [¶]  (3) Destroys."  (See *In re Leanna W.* (2004) 120 Cal.App.4th 735, 743 (*Leanna W.*) ["To commit vandalism within the meaning of Penal Code section 594, an individual must maliciously damage or destroy any real or personal property not his or her own"].)  The statute's operative verbs—"[d]eface," "[d]amage," and "[d]estroy"—all imply some causal connection between the malicious act and resulting damage to real or personal property.  It follows

16

that Penal Code section 594, subdivision (a) requires proof the act caused actual damage to real or personal property. (*Leanna W., supra*, at pp. 743-744 [evidence insufficient to support conviction for vandalism where there was no evidence the juvenile was the person who damaged or destroyed property]; see also *People v. Schmies* (1996) 44 Cal.App.4th 38, 46-47 ["The principles of causation apply to crimes as well as torts. . . . 'Just as in tort law, the defendant's act must be the legally responsible cause ("*proximate cause*") of the injury, death or other harm which constitutes the crime' "].) Thus, to establish the predicate violation of Penal Code section 594, subdivision (a), the Department was required to prove by a preponderance of the evidence that Welch's malicious acts caused damage to the bicycle tires.[7] The trial court determined the evidence fell short of proving damage attributable to Welch, and substantial evidence supports that determination.

Although Welch admitted popping the tires, there was evidence from which the trial court could infer the tires were already extensively damaged when he did so. As the trial court explained, "Boutin, whom the Court found to be extremely credible, inspected the tires of the bicycle, and noted they were 'loaded' with goat heads. He was unable to locate the damage to the tires allegedly caused by Welch." Boutin's report constitutes substantial evidence the tires were already damaged by the time Welch came along. The Department presented no evidence that Welch caused meaningful additional damage to

---

[7] The City argues the trial court erroneously relied on *Cranston* and *Ziegler v. City of South Pasadena* (1999) 73 Cal.App.4th 391 for the proposition that a city can only terminate a police officer for a criminal act so long as the act caused damage or risk of harm. We are not convinced the trial court advanced any such proposition. Instead, the trial court offered *Cranston* and *Ziegler* as examples of alleged violations (speeding and hit-and-run driving, respectively) posing a greater risk of harm than Welch's conduct here. Regardless, we do not need to decide whether *Cranston* or *Ziegler* requires proof of a causal connection between criminal act and resulting harm, as we conclude the alleged violation of Penal Code section 594, subdivision (a) does.

the tires, beyond the punctures already caused by the goat heads.  Thus, the trial court could reasonably conclude the finding that Welch violated Penal Code section 594, subdivision (a) was not supported by substantial evidence.

The City challenges the trial court's view of the evidence, arguing the court misinterpreted Boutin's statement that the bicycle tires were "loaded with goat heads," attached undue significance to the broken bicycle chain, and gave insufficient weight to Welch's alleged admissions that he damaged the tires and committed vandalism.  These arguments are invitations to reweigh the evidence, which we cannot do.  (*Candari, supra*, 193 Cal.App.4th at p. 408; *Deegan, supra*, 72 Cal.App.4th at p. 45.)  Rather, we accept any reasonable interpretation of the evidence which supports the trial court's decision.  (*Candari, supra*, at p. 408; *Deegan, supra*, at p. 45.)  Doing so, we are satisfied Boutin's report can be reasonably read to say that no damage attributable to Welch could be found on the tires because they were already extensively damaged by goat heads.  We are also satisfied the trial court could reasonably rely on evidence of the broken bicycle chain to support an inference that the bicycle as a whole was so ramshackle that any additional damage would have been difficult to discern, let alone prove.  Likewise, the trial court could reasonably credit Boutin's statement that he could not locate any damage attributable to Welch over Welch's one-word response to the question whether he damaged the tires.  The trial court could also reasonably disregard Welch's response to the question whether he committed an act of vandalism on the tires, as that was a legal question for the court to decide.

For all of these reasons, we conclude that substantial evidence supports the trial court's determination that the evidence was insufficient to establish the alleged violation of Penal Code section 594.  Having done so, we can also conclude that substantial evidence supports the trial court's determination that the evidence was insufficient to establish the alleged violation of section 318.5.1(c) of the Manual.  We therefore reject

18

the City's challenge to the sufficiency of the evidence supporting the trial court's determination that no violation of section 318.5.1(c) was shown.

D.      *Substantial Evidence Supports the Finding the Department Failed to Establish Neglect of Duty*

The City next challenges the sufficiency of the evidence supporting the trial court's determination that the evidence was insufficient to show that Welch neglected his duties in violation of section 318.5.3(a) of the Manual.  As mentioned, the trial court looked to Government Code section 19572 for the meaning of the phrase "neglect of duty."  That statute establishes grounds for discipline for state employees, including "[i]nexcusable neglect of duty," (Gov. Code, § 19572, subd. (d)) which refers to an act done "intentionally, designedly and without lawful excuse" (*Peters v. Mitchell* (1963) 222 Cal.App.2d 852, 862).  This was error, the City says, because section 318.5.3(a) only reaches "neglect of duty," not "inexcusable neglect of duty," which encompasses *both* intentional *and* grossly negligent failures to perform official duties.  (See *People v. McCaughan* (1957) 49 Cal.2d 409, 414 ["The phrase 'neglect of duty' has an accepted legal meaning.  It means an intentional or grossly negligent failure to exercise due diligence in the performance of a known official duty"].)  Applying that standard, the City argues the evidence shows Welch was grossly negligent in the performance of his duties.  The City's argument misses the mark for two reasons.

First, the City sets its sights on the wrong target.  The City argues the trial court "overlooked the substantial evidence presented in the administrative hearing that Welch *did* fail to perform the duties required of him."  But our review focuses on the trial court's findings, not the City Council's.  (*Candari, supra*, 193 Cal.App.4th at p. 408; *Deegan, supra*, 72 Cal.App.4th at p. 45.)  We are concerned with the existence of substantial evidence supporting the trial court's finding that the evidence was insufficient to support a finding that Welch neglected his duties, whether contradicted or not.  It is immaterial that there may exist evidence in the record that could support the opposite conclusion.

19

Second, the gross negligence standard does not help the City.  We assume for argument's sake that "neglect of duty" encompasses gross negligence.  Even so assuming, the trial court could have reasonably determined the evidence was insufficient to support a finding that Welch was grossly negligent.

" 'Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.  [Citation.]  "The state of mind of a person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.' " ' " (*Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1027-1028 (*Brown*).)  " ' " ' "[M]ere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty," ' amounts to ordinary negligence.  [Citation.]  However, to support a theory of ' "[g]ross negligence," ' a plaintiff must allege facts showing 'either a " ' "want of even scant care" ' " or " ' "an extreme departure from the ordinary standard of conduct." ' " ' " ' " (*Ibid.*)

The trial court found the evidence failed to establish intentional neglect of a duty to investigate because: (1) Welch had discretion to determine if further investigation was necessary; (2) none of the maintenance workers felt threatened by the individual; (3) the individual was gone, and Welch heard no screaming or other disturbance coming from the creek or greenway; and (4) there was no reported damage to any of the structures.  The same evidence tends to disprove gross negligence.  Thus, the trial court could have reasonably found that Welch briefly and appropriately questioned the maintenance workers, satisfied himself the erratic individual was gone, and determined that no one was hurt and there was no damage to any of the structures.  Given these facts, the trial court could have determined Welch reasonably exercised his discretion to forego further investigation, especially considering he was alone.  That another officer might have exercised his discretion differently does not establish a " ' " ' " ' " "want of even scant care" ' " ' " ' " or " ' " ' " ' "an extreme departure from the ordinary standard of conduct." ' " ' " ' " (*Brown, supra*, 76 Cal.App.5th at p. 1028.)  Substantial evidence

20

would thus support a determination that the evidence was insufficient to establish gross negligence in connection with the alleged failure to investigate, assuming that standard applies.

Substantial evidence would also support a determination that the evidence was insufficient to establish gross negligence in connection with the failure to respond to requests for trial by declaration. The trial court found Welch (1) "did not know or understand that a defendant could demand a trial by declaration;" (2) "had not received any training on completing trials by declaration," and (3) missed the requests because he "failed to inspect his mailbox." The trial court could reasonably determine that this evidence established ordinary negligence, not an extreme departure from the ordinary standard of conduct. Substantial evidence thus supports the trial court's finding that the evidence was insufficient to support a finding that Welch neglected his duties in violation of section 318.5.3(a) of the Manual.

E. *Substantial Evidence Supports the Finding the Department Failed to Establish Conduct Unbecoming*

The City next argues the trial court erred in finding the evidence was insufficient to establish that Welch violated section 318.5.5(m) of the Manual by engaging in conduct unbecoming a member of the Department. As previously discussed, the trial court relied on *Cranston* to conclude "conduct unbecoming" means "conduct which indicates a *lack of fitness* to perform the functions of a police officer." (*Cranston, supra*, 40 Cal.3d at p. 769.) The City accepts the trial court's understanding of the law, but argues the court erred in finding the evidence was insufficient to establish Welch's lack of fitness. This is so, the City says, because Welch admitted popping the bicycle tires, which was vandalism within the meaning of Penal Code section 594, subdivision (a), and criminal conduct establishes unfitness. We have already rejected this theory. As previously explained, Welch admitted "popping" the tires, but there was substantial evidence from which the trial court could determine the evidence was insufficient to show damage to the tires, an

21

essential albeit implied element of vandalism.  (*Leanna W., supra,* 120 Cal.App.4th at pp. 743-744.)  It follows that the evidence was also insufficient to show that Welch was unfit because he engaged in criminal conduct.

Taking a different tack, the City argues Welch's conduct indicates unfitness whether or not popping bicycle tires constitutes a crime.  This argument has some persuasive force.  After all, there was no law enforcement reason to pop the bicycle tires, and everyone agrees the act was unprofessional and reflected poorly on Welch and the Department.  As the trial court accurately observed, "Welch's actions were unwise" and "improper."  At the same time, there was substantial evidence from which the trial court could have reasonably determined that popping bicycle tires, though unwise and improper, was not an indication of unfitness.

Several witnesses testified that members of the Department have been known to intentionally destroy property belonging to homeless people.  Boutin, who the trial court found to be "the most unbiased and credible person involved in the internal affairs investigation and hearing," said members talked about "big winds" that damaged or destroyed homeless encampments, which was understood to refer to acts of deliberate destruction.  Welch, who was also deemed credible by the trial court, confirmed that "winds" were a euphemism for the destruction of homeless encampments, and popping the tires of homeless people's bicycles had been an accepted practice until recently.  A former member of the Department recalled seeing Betts throw a homeless person's machete into Yreka Creek.  The same former member testified Gamache and Betts laughed at jokes about things getting " 'awfully windy down in the creek.' "  Even Gamache, who the trial court found not credible, acknowledged that members of the Department had destroyed property belonging to homeless people.[8]  Significantly, there

---

[8] Gamache testified that the practice of destroying homeless people's property either ended in the 1990s or when he became chief of police two or three years prior.

was no evidence that anyone other than Welch had ever been disciplined—let alone terminated—for interfering with such property.

On the record before us, the trial court could reasonably infer that members of the Department destroyed property belonging to homeless people from time to time, and that conduct was known to the leadership and tacitly accepted. That inference, in turn, supports the conclusion that Welch's behavior was consistent with the culture of the Department, such that the act of inflicting imperceptible damage to an inoperable and abandoned bicycle, however inappropriate, could not be credibly characterized as an indication of unfitness. The trial court was empowered to make such factual and credibility determinations, and substantial evidence supports the court's determination that the evidence was insufficient to support the finding that Welch violated section 318.5.5(m) of the Manual by engaging in conduct unbecoming a member of the Department.

F.     *The Trial Court Correctly Concluded that Termination was an Abuse of Discretion*

Finally, the City argues the trial court erred in remanding the matter to the City Council to reconsider the appropriate discipline in light of the court's factual findings. The City argues the trial court improperly substituted its own judgment for that of the City Council and gave insufficient weight to the supposedly undisputed evidence. As we have explained, however, the trial court was authorized to issue its own factual findings when independently reviewing the City Council's decision. (*Candari, supra*, 193 Cal.App.4th at p. 408; *Deegan, supra*, 72 Cal.App.4th at p. 45.) The trial court found the evidence was insufficient to establish any of the alleged violations of the Manual, and we have concluded the court's findings are supported by substantial evidence. Given the trial court's factual findings, we conclude the decision to terminate Welch was an abuse of discretion.

Although Welch acted unprofessionally and the City Council enjoys broad discretion in matters of discipline, the City Council's powers are not absolute, and

23

reasonable minds must agree that the penalty of termination is an abuse of discretion where none of the asserted violations has been established. (*Skelly v. State Personnel Board, supra*, 15 Cal.3d at pp. 217-218.) We therefore conclude the trial court properly ordered the City Council to set aside the termination and reconsider the question of discipline.

### III.  DISPOSITION

The judgment is affirmed. Respondent shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____
RENNER, J.



We concur:


/S/

_____
HULL, Acting P. J.


/S/

_____
KRAUSE, J.